*Decision will be entered under Rule 50.*

FRANK J. EVANS AND MARGUERITTE A. EVANS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2842–66.     Filed August 17, 1967.

---

[2] Under sec. 1.453–4, Income Tax Regs., we are dealing only with property subject to the lien.

*Martin J. May*, for the petitioners.
*Lester R. Uretz*, for the respondent.

OPINION

Tietjens, *Judge:* The Commissioner determined deficiencies in income tax as follows: 1962, $236.43; 1963, $1,089.35.

The petitioners claim an overpayment of $1,239.63 in income taxes for 1962.

The sole issue is whether all or any part of the systems used to furnish water, gas, electricity, and sewage disposal services to occupants of petitioners' trailer park are section 38 property as defined in section 48(a)(1) of the Internal Revenue Code of 1954.[1] The other issues raised by the pleadings have been conceded by the respondent, and the concessions will be given effect under Rule 50.

All of the facts are stipulated, and are so found. The exhibits and facts are included herein by this reference.

Petitioners, Frank J. Evans and Margueritte A. Evans, are husband and wife. They reside in Santa Cruz, Calif. They filed joint income tax returns for the years 1962 and 1963 with the district director of internal revenue at San Francisco, Calif.

In 1962, the petitioners purchased a used 111-space mobile home park, Opal Cliffs Mobile Homes Park (hereinafter referred to as Opal Cliffs), for a total purchase price of $327,000. Of the total purchase price, $143,000 was the cost of the land, and the balance of $184,000 was the cost of the improvements, of which at least $12,500 was the cost of each one of the four utility systems: A sewage disposal system, a water distribution system, an electrical energy distribution system, and a natural gas distribution system.

During 1962 and 1963, the petitioners engaged in the operation of Opal Cliffs, and in connection therewith operated the four utility systems in the following manner.

The sewage disposal system did not require any special attention. The petitioners charged mobile homeowners a monthly rental, which included a fee for use of the disposal system. It was connected to the East Cliff Sanitation District and under the control of Santa Cruz County, Calif.

The water was supplied by the C. L. Beltz Water System, a public utility operating under authority from the California Public Utilities Commission. Each mobile home owner was charged $2 per month for water by the petitioners as part of the monthly rental for space in

---

[1] All statutory references are to the Internal Revenue Code of 1954.

accordance with the schedule of rates established by the California Public Utilities Commission. The petitioners, in turn, paid an average of $50 per month for all the water used in Opal Cliffs.

The petitioners purchased all the electrical energy used in Opal Cliffs from Pacific Gas & Electric Co. at a fixed rate. They, in turn, supplied the electrical energy to the residents of Opal Cliffs. The petitioners read the meters, maintained appropriate records, and billed the mobile home owners each month for the quantity of electrical energy used during the previous month. This amount was determined in accordance with a schedule of rates approved by the California Public Utilities Commission.

The petitioners operated the natural gas distribution system in the same manner as the electrical distribution system.

The four utility systems had useful lives of 20 years for computing depreciation.

The petitioners filed their original Federal income tax return for the year 1962 without claiming any investment credit. They later filed an amended return for the same year and included a computation of the investment credit claiming the four utility systems plus other items not here in issue as assets qualifying as section 38 property. The investment credit total was $3,696.70 of which $1,152.11 was used to offset the income tax for the year 1962. The application of the credit resulted in an overpayment for that year in the amount of $1,239.63. The difference between the investment credit claimed to be used in 1962 and the claim for refund is due to other adjustments made on the amended return. These adjustments are not here in issue. For the taxable years 1962 and 1963 the Evanses filed their returns stating that Frank's occupation was trailer park operator, and Margueritte's occupation was housewife.

In the explanatory statement accompanying the deficiency notice it was "held that the trailer park improvements and the washing machines and dryers do not fulfill the requirements for investment credit under sections 38, 46, 47 and 48 of the Internal Revenue Code of 1954."

The Commissioner has conceded that the washing machines and dryers qualify for investment credit.

Section 38 provides as follows:

SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.

(b) REGULATIONS.—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.

The problem in this case is to determine whether the so-called utility system purchased by the petitioners fall within the terms of

"section 38 property" as defined in section 48.[2] On this point petitioners in their briefs take the "basic position that the four utility systems qualify as Section 38 property under Section 48(a) (1) (B) ;" in other words, that the water, gas, electric, and sewage systems are an integral part of furnishing such services just as stated in section 48(a) (1) (B).

And, at first blush, the petitioners' position seems unassailable. But here section 1.48–1(a), Income Tax Regs.,[3] causes trouble because it explains that in order to be entitled to the investment credit for property used as an integral part of furnishing electrical energy, gas, water, or sewage disposal services, the property must be used "by a person engaged in a trade or business of furnishing any such service."

The petitioners attempt to meet this difficulty in two ways. *First,* they contend the regulations are invalid because they add a requirement that is beyond the intent of Congress which requirement was not contained in the committee reports but only in the technical explanations appended thereto.

Petitioners are in error. It has been held that the technical explanations are integral parts of the committee reports. *Frederick W. Denniston,* 41 T.C. 667, 673 (1964), affirmed per curiam 343 F. 2d 312 (C.A.D.C. 1965). And as we said in *Douglas H. Tanner,* 45 T.C. 145, 148, affirmed per curiam 363 F. 2d 36 (C.A. 4, 1966) :

> The Supreme Court has held that in the interpretation of the statutes the function of the courts is to construe the language so as to give effect to the intent of Congress and that when aid to the construction of the meaning of words used therein is available resort may be had to such aid, however clear the statutory words may appear (*United States* v. *American Trucking Ass'ns,* 310 U.S. 534) ; that when Congress by statements made in its committee reports, in anticipation of a particular question, makes its purpose clear, it is proper to rely upon such statements (*Commissioner* v. *Bilder,* 369 U.S. 499) ; that Treasury regulations constitute contemporaneous constructions of statutes by those charged with the administration thereof which should not be overruled except for weighty reasons, but must be sustained unless unreasonable and plainly inconsistent with the statutes. (*Commissioner* v. *South Texas Lumber Co.,* 333 U.S. 496) ; * * *

---

[2] SEC. 48. DEFINITIONS; SPECIAL RULES.
  (a) SECTION 38 PROPERTY.—
    (1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—
      (A) tangible personal property, or
      (B) other tangible property (not including a building and its structural components) but only if such property—
        (i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

[3] Sec. 1.48–1 Definition of section 38 property.
  (a) *In general.* * * * the term "section 38 property" means property * * * which is either (i) tangible personal property, (ii) other tangible property (not including a building and its structural components) but only if such other property is used * * * as an integral part of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services *by a person engaged in a trade or business of furnishing any such service* * * * [Emphasis supplied.]

Clearly the regulations are not "unreasonable and plainly inconsistent" with the intent of the statute. It is apparent when the technical explanations (H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 503, 516; S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 843, 859,[4]) are compared with the regulations (sec. 1.48–1(a)(ii)) that the regulations not only do not differ from, but are almost identical to the committee reports. The order of the phrases was changed; however, this difference in draftsmanship imports no meaning inconsistent with the intention of the statute as evidenced by these committee reports. We sustain the validity of the regulations.

*Second*, petitioners contend that if we hold the regulations valid, which we have, they are nonetheless "engaged in a trade or business of furnishing" electrical energy, gas, water, and sewage disposal service.

We think the petitioners have failed to carry their burden in this respect. The stipulated facts merely show that petitioners read meters, maintained the appropriate records, and billed the mobile home owners in Opal Cliffs for the various utility services used. These factors, being the only ones shown, do not convince us that petitioners fall under section 1.48–1(a) of the regulations, as "person[s] *engaged in a trade or business of furnishing* any such service." (Emphasis supplied.) While these activities might be some evidence tending to prove what they are contending, alone they are not enough to persuade us that the operation of these utilities constitutes trades or businesses of petitioners distinct from their trade or business of operating a trailer park.

It is true that taxpayers can have more than one trade or business. Again the burden of proving this remains on the taxpayers. The record does not show what was entailed in the "operation" of the utilities other than keeping the records and paying and collecting bills. Nor can we ascertain the amount of petitioners' time, if any, spent in maintaining, repairing, and supervising the systems; nor the amount of gross receipts, net profit, or even a good faith expectation of profit from furnishing these services. Accordingly, we cannot find from the meager facts stipulated that the petitioners were in the trade or business of furnishing electrical energy, gas, water, or sewage disposal services. More appropriately, it appears that petitioners' real trade or business was that of operating a trailer park as stated on their tax returns and indicated by the stipulated facts. Their utility activities were only incidental to the operation of that business.

Operating a trailer park as the petitioners' trade or business might entail providing a number of services to the renters of trailer space.

---

[4] "Property is to be considered as being used as an integral part of a system of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services only if such property is used by one engaged in the trade or business of furnishing such services." S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 843, 859.

Certainly, as a practical matter, each of these services would not constitute a separate trade or business of the owner-operators. At most, these activities would only contribute to the marketability of sites in the trailer park. Therefore, in order to find that these activities constitute another trade or business of the petitioners, it would have to be shown that these activities earned a substantial amount of income, separate from the trailer park rental fees, and that there was a good faith intention of making a profit from them in and of themselves. The facts stipulated are insufficient to determine whether the petitioners' income was significant or that they possessed a profit motive attributable to these alleged separate businesses. It appears entirely possible that the petitioners provided some of these services at cost to the tenants. If so, these activities would merely be incidental to the operation of the park. As the petitioners did not sustain their burden of proof, we cannot find they were engaged in the separate and distinct trade or business of furnishing utility services.

As a further argument, the petitioners contend that a substantial portion of the cost of the gas and electrical distribution systems is represented by the meters, which qualify as "tangible personal property" within the meaning of section 48(a)(1)(A) and, accordingly that they, at least, should receive the investment credit with respect to these meters.

We find it unnecessary to discuss whether these gas and electrical meters satisfy the tests for "tangible personal property." The record contains no evidence of their cost as a separate item nor is there any basis for an allocation. This fact is material to the petitioners' theory, as the amount of investment credit is based on the cost of used section 38 property. Sec. 46(c)(1)(B). The only mention of the cost which might be allocable to the meters is made on brief. Under Rule 31(f), Tax Court Rules of Practice, such statements do not constitute proof. The petitioners, in order to avail themselves of the statute, must prove all elements required by the statute, as they must bear the burden of proof. *Estate of James M. Lawton*, 33 T.C. 47 (1959). This burden has not been carried.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

Drennen and Featherston, *JJ.*, dissent.

---

Tannenwald, *J.*, concurring: I am in complete agreement with the result reached by the majority. I am concerned, however, that the majority analysis of "a trade or business" may be misapplied or misinterpreted in other situations having broader application than the

meaning of the statutory provision involved herein. We have previously been exposed to the complications of "separateness" in the trade or business area. Cf. *Edmund P. Coady*, 33 T.C. 771 (1960), affd. 289 F. 2d 490 (C.A. 6, 1961). I see no need to expand the fertile field of argument on this issue, or the significance of the profit motive in connection therewith, when this course can be avoided.

In my view, the key word in section 48(a)(1)(B)(i) is "furnishing." A review of the legislative history indicates clearly that, in the context of this case, Congress had in mind a supplier, and not a consumer, of the described services, as those roles are understood in the business world. Support for this position can be found in the underlying purposes of the restricted investment credit available for "public utility property" contained in section 46(c)(3) and of the exclusion, with well defined exceptions, of "property used for lodging" in section 48(a)(3). See "Detailed Explanation of the President's Recommendations Contained in his Message on Taxation," Hearings before House Committee on Ways and Means on President's 1961 Tax Recommendations, 87th Cong., 1st Sess. (1961), vol. 1, pp. 256–257; General Explanation of Committee Discussion Draft of Revenue Bill of 1961, prepared by the Staff of the Joint Committee on Internal Revenue Taxation, p. 9 (Sept. 29, 1961); H. Rept. No. 1447, 87th Cong., 2d Sess., pp. 10, 12, A9, A20 (1962); S. Rept. No. 1881, 87th Cong., 2d Sess., pp. 14, 16 (1962).

Only in a hypertechnical sense could petitioners be considered suppliers of the described services. They were in point of fact merely a conduit for the services from the terminal point of the distribution systems. Realistically, they were consumers. As such, they did not fall within the broad purpose of the investment credit provisions, namely, "to encourage modernization and expansion of the Nation's productive facilities and to improve its economic potential." See H. Rept. No. 2508, 87th Cong., 2d Sess., p. 14 (1962); *Madison Newspapers, Inc.*, 47 T.C. 630, 635 (1967). Perhaps, if petitioners had operated their own power station, or purchased and stored bottled gas in quantity, and maintained systems of distributing electricity or gas therefrom to their trailer park tenants, they would be entitled to the benefit of the investment credit—whether or not they operated such systems separately or at a profit. Obviously, such situations are not now before us. They suggest, however, some of the difficulties which are created by the rationale of my colleagues in the majority.

I would hold that petitioners do not satisfy the "furnishing" requirement of section 48(a)(1)(B)(i).

RAUM, *J.*, agrees with this concurring opinion.