JOHN C. GRAYBEAL AND JOYCE B. GRAYBEAL, DECEASED, by JOHN C. GRAYBEAL, PERSONAL REPRESENTATIVE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Graybeal v. Commissioner
Docket No. 6134-78.
United States Tax Court
T.C. Memo 1979-506; 1979 Tax Ct. Memo LEXIS 20; 39 T.C.M. (CCH) 734; T.C.M. (RIA) 79506; December 17, 1979, Filed *20 In 1963 petitioners purchased a 225-acre farm. Depreciable structures on the property consisted of a house and barn. In 1973 petitioners began development of an RV campground on 52 acres of their 225-acre farm. Petitioners built on the RV campground a water, sewage and electrical system. Held, petitioners are in business of furnishing water, sewage and electrical utilities within the meaning of secs. 38 and 4,, I.R.C. 1954. Held further, petitioners improperly allocated their basis in the 225-acre farm between the depreciable improvement and non-depreciable land. Held further, petitioners are not entitled to a sec. 162 or sec. 212 deduction for expenses incurred in anticipation of the opening of the RV campground. William B. Dulany, for the petitioners. Robert A. Miller, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: In his notice of deficiency dated March 15, 1978, respondent determined deficiencies in petitioners' income taxes paid for the following taxable years and in the following amounts: Taxable Year Ended
Amount
12/31/70 $ 830.73
12/31/71
2,076.82
12/31/72
1,246.08
12/31/73
1,219.96
12/31/74
2,091.28
$7,464.87
*22 The questions before the Court are: (1) whether the depreciation claimed in 1973 and 1974 on a house and barn which were acquired in 1963 as part of the purchase of a 225-acre farm was overstated due to petitioners' assigning too high a value to the structures in relation to the value of the 225-acres of farm land; (2) whether certain expenditures made by petitioners during the first 6 months of 1973 were improperly claimed as deductions on petitioners' income tax returns for 1973 (Schedule C) since such expenditures constituted business start-up costs and should have been capitalized; and (3) whether petitioners improperly claimed the investment credit on certain assets acquired in 1973 and 1974 as such assets did not qualify as section 38, I.R.C. 1954, assets upon which the investment credit is entitled to be claimed. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. John C. Graybeal and Joyce B. Graybeal, deceased (petitioners), at the time of the filing of the petition herein, resided in Hampstead, Maryland. Petitioners filed timely *23 joint individual income tax returns for the years 1970 through 1974, inclusive. Petitioners had claimed, and had been allowed, tentative refunds from 1970, 1971 and 1972 in the amounts of $830.73, $2,076.82, and $1,246.08, plus interest, respectively, due to claimed investment credit carrybacks from 1973 and 1974. Taxable years 1970, 1971, and 1972 are involved in this case only to the extent that petitioners claim that they are entitled to investment credit carrybacks from 1973 and 1974. Petitioner-husband was employed during the years in issue as director of personnel for the Carroll County Board of Education. Petitioner-wife was a homemaker who was also employed as a part-time teacher. In 1963 petitioners purchased a farm outside Downsville in Washington County, Maryland, at a cost of $28,000. A barn and house constituted the depreciable structures on the property. For the purposes of depreciating the structures on the straight-line method with a useful life of 25 years, petitioners assigned a value of $9,500 to the barn and $11,000 to the house. Prior to the calendar year 1973, petitioners had claimed and been allowed $3,800 as depreciation on the barn and $4,400 as *24 depreciation on the house. For taxable years 1973 and 1974 petitioners claimed depreciation with respect to the barn of $380 and $440 on the house, for a total of $820 for each year. During the 1963 through 1965 period, the Washington County Asessor's Office (Assessor's office) made assessments with respect to both land and buildings based on 50 percent of what that office determined to be the fair market value of the land and buildings. In 1963, the Assessor's office records indicate that petitioners' Downsville farm was assessed at $13,620 of which $3,350 represented improvements and $10,270 represented land. On July 14, 1964, the Assessor's office made a physical inspection of the Downsville farm and the records of that office for 1965 show that the Assessor's office assessed the farm at $24,200, of which $8,850 represented improvements and $15,350 represented land. Respondent determined that the correct allocation between land and improvements for the farm when received in 1963 was the same ratio as that determined by the Assessor's office in 1965, namely, 63.43 percent to the land and 36.57 percent to improvements. Respondent allocated 36.57 percent of the $28,000 fair *25 market value of the farm (purchase price) to improvements. Of the $10,240 allocated to improvements, respondent allocated $4,745 to the barn and $5,495 to the house. Respondent further determined that, as of the beginning of the calendar year 1973, there remained only $945 for the barn and $1,095 for the house to be depreciated over their remaining 16-year lives, the balance of the petitioners' basis in such assets having been already allowed as depreciation in previous years. For 1973 respondent allowed depreciation on the barn of $59 and on the house of $69 for a total of $128 rather than the $820 pertaining to the structures as claimed by the petitioners on their 1973 return. Records of the sales prices of farm sales in Washington County were kept by the Washigton County Assessor's office starting in 1965. The Assessor's office took the selling price of each farm sold in 1965, subtracted two times the assessed value of improvements, and arrived at a price for land only which, when divided by the number of acres sold, yielded a selling price per acre. The price per acre of sales of farm property in Washington County in the general time frame when petitioners purchased the *26 Downsville property was in excess of $100 per acre. In January 1973, petitioners began to develop facilities on 52 acres of their 225-acre farm property for use as a recreational vehicle (RV) campground to accommodate predominantly transient clientele. For 1973 petitioners claimed, on Schedule C, a loss of $5,988.45 covering the first 6 months of 1973 allegedly from the carrying on of a campground activity. The claimed loss consisted of the following items: Depreciation
$ 618.00
Repairs
74.61
Salaries & Wages
48.00
Insurance
282.00
Interest on business debt
2,016.67
Other (telephone, etc.)
2,453.83
$ 5,493.11
Other labor
495.34
TOTAL LOSS
$ 5,988.45
Respondent allowed the $2,016.67 interest expense claimed as a business expense as an itemized interest deduction and disallowed the balance of the claimed business expenses. The expenses for which the deductions were claimed were incurred in connection with the development of an RV campground and were incurred during the first 6 months of 1973. On July 1, 1973 petitioners formed a corporation known as Graybeal and Sons, Inc. for the purpose of operating a RV campground, a franchise operation *27 to be known as Safari Campground. Prior to the opening of the campground petitioners apparently leased the campground on their farm property to this corporation and the income that was earned from the campground during 1973 was the corporate income. Petitioners did not receive rent from the corporation during 1973. The RV campground did not open for business until late September 1973, and no income from it was generated until after that time. Neither the lease nor any further facts with respect to the corporate-shareholder relationship were introduced into evidence. For calendar years 1973 and 1974, petitioners claimed that certain assets acquired in 1973 and 1974, respectively, were section 38 assets upon which they were entitled to claim the investment credit. Respondent determined that some of the assets upon which the investment credit was claimed were not section 38 assets and the petitioners contest that determination with respect to the following: ITEM
COST
1973
1974
a. Well
$ 463.00
$0
b. Pool
14,157.00
0
c. Sewage System
21,047.00
6,212.61
d. Water System
2,844.16
1,754.81
e. Electrical System
7,937.05
6,032.73
f. Roadways & Trailer
Sites
12,042.00
1,244.31
g. Bathhouses, Fixtures
and Heater
1,010.09
10,018.02
TOTAL
$59,500.30
$25,262.48
*28 With respect to the well, the amount in dispute represents solely the investment credit on the cost of drilling a fresh water supply at the campground site. The amount shown on the above schedule with respect to the pool represents solely that portion of the total contract price for the materials and installation of a pool, deck and fence. An allowance of 10 percent of the total pool contract price has already been allowed for pool equipment qualifying for the investment credit and is not at issue. The sewer system upon which the investment credit was claimed consists of an eight-inch terra cotta main sewer line, four manholes, a series of six-inch lateral lines and four-inch cast iron hookup lines to twenty-eight individual campsites, and two dumping stations. The water system upon which the investment credit was claimed consists of one and one-half inch main lines with one and one-fourth inch and one inch subfeeds serving eighty-five individual hookup sites and four locations where water can be drawn that are not associated with a particular campsite. The electrical system upon which the investment credit is claimed consists of underground main feed lines and subfeed lines *29 which connect to above-ground power recepticles at one hundred individual camp sites. The roadways and trailer sites upon which the investment credit is claimed are gravel roadwys and trailer sites which were developed on wooded and open terrain, with no grading other than removing woods, dirt, or topsoil for placement of stone for settlement purposes. The amount shown on the above schedule for 1973 with respect to bathhouses, fixtures and heaters, represents the cost of materials and installation of a hot water heate, plumbing and plumbing fixtures in a bath-house. The amount shown on the above schedule for 1974 with respect to bathhouses, fixtures and heaters, represents the cost of constructing a bathhouse which is an eight-sided concrete building with a shingle roof which houses lavatory and shower facilities, and includes the cost of materials and installation of a hot water heater, plumbing and plumbing fixtures in that bathhouse. No separate bookkeeping system is kept with respect to either the sewer, water or electrical systems but rather the bookkeeping is kept on an overall campground basis. The campground provided water, sewage and electrical services to RV's. RV *30 operators could also purchase propane gas from the campground. The average stay at the campground was 1.55 nights. In addition to the utilities the overnight users could obtain athletic equipment, swim or play mini golf. The campground would arrange special events such as hayrides and movies for overnight campers. The rates per day at the campground were: (a) $6.00 without electricity, (b) $6.50 with an electrical hookup, (c) An additional $.50 for using an air conditioner or heater; and (d) An additional $.50 for direct hookup to the sewer system. For RV's just passing through, there was a charge of $2.00 for the use of the dumping station which also entitled the RV's to fill their tanks with water. There are no individual electrical meters at the 100 individual campsites. The electrical power used by the entire campground is purchased from the Potomac Edison Company and is metered through one meter. Almost all RV's which stay at the petitioners' campground, hook up to the electrical recepticles at the individual campsites.The average electricity consumption by an RV per day is 8-1/4 kilowatt hours. The cost of providing the electricity is between 29 and 32 cents *31 per unit per night. The 50" additional charge for electricity has an anticipated profit of approximately 40 percent. The water and sewer systems were established on the petitiners' land and do not represent purchased utilities. OPINION The first question presented is whether petitioners, in allocating the purchase price in 1963 of the Downsville farm between land and improvements, improperly placed too high a proportion of the purchase price (their basis) on improvements and as a consequence overstated depreciation on the buildings in 1973 and 1974. The amount of depreciation allowable is limited to the cost of the depreciable assets acquired. Where property consists of land and buildings, the purchase price must be allocated between the nondepreciable land and the depreciable buildings. The depreciation allowance is limited to an amount which bears the same proportion to the price paid as the value of the depreciable property at the time of acquisition bears to the whole property at that time. Section 1.167(a)-5, Income Tax Regs.
Petitioners used the income method to allocate their basis between the depreciable and nondepreciable property.They argue that the income-producing *32 ability of the house and barn was over twice the rental value of the farm lands. For this reason petitioners allocated $20,500, or approximately 73 percent of their cost basis, to the improvement and $7,500, or 27 percent, to the land. Respondent argues that the assessment by the Washington County Assessor's Office is the best evidence available for determining the proper allocation of the purchase price between the land and buildings in 1963. We agree with respondent. The records of the Assessor's office show that the Downsville farm had an assessed value of $13,620 in 1963, of which $3,350 was allocated to improvements and $10,270 was allocated to land. The farm was physically inspected by the Assessor's office on July 14, 1964 and records of that office for 1965 show that the farm was assessed at a value of $24,200, of which $8,850 represented improvements and $15,350 represented land. During the 1963 through 1965 time period, the Assessor's office assessed both land and improvements at 50 percent of what it determined were their fair market values. Translating the 1963 and 1965 figures, the following results: 1963
Fair Market
Assessed
Value
Percentage
Improvements
$ 3,350
$ 6,700
24.60
Land
10,270
20,540
75.40
$13,620
$27,240
100
1965
Fair Market
Assessed
Value
Percentage
Improvements
$ 8,850
$17,700
36.57
Land
15,350
30,700
63.43
$24,200
$48,400
100
*33 The percentage of the total value (whether assessed or fair market value according to the Assessor's office) of the farm allocated to improvements went up in the period 1963 to 1965 from 24.60 to 36.57 percent and, conversely, the percentage allocable to land shrunk from 75.40 to 63.43 percent. Respondent used the 1965 figures in assigning the percentage of the purchase price to be properly allocable to the land and improvements. Applying the ratio of land to improvements used by the Assessor's office in 1965 to petitioners' purchase price the price paid per acre would be in line with land prices in Wshington County during the relevant periods. Respondent's determination of the proper value to be allocated to the land when acquired in 1963 amounts to a valuation of $78.94 per acre whereas petitioners' valuation would allocate value to the land of only $33.33 per acre. Records were kept by the Assessor's office of all farm sales in Washington County beginning in 1965. The sales records indicate the purchase price, the improvement assessment, and the number of acres. According to the testimony of the supervisor of assessments for the county, these records indicate that, in *34 areas somewhat geographically near the Downsville property and representative of such farm, farms sold from $156 per acre to several hundred dollars per acre in 1965. Further, the supervisor testified that for the year 1963 most sales of farm property in Washington County were for at least $100 per acre. Respondent's allocation of $78.94 to each acre is more in keeping with sales of farm property in Washington County for the relevant years. Further, we believe petitioners' value of only $33.33 per acre to be unrealistically low. The income method used by petitioners is one means of allocating cost basis but it is only acceptable when it fairly allocates the purchase price between the depreciable and nondepreciable property. Petitioners rented the entire property for $160 a month. According to petitioner-husband's testimony petitioners would have been able to rent the house and barn without the farm land for between $125 and $150 per month. The only evidence presented by petitioners with respect to the rental value of the land was an uncertain approximation by petitioner-husband. In addition, Mr. Graybeal testified that, in allocating the basis for the purpose of depreciation, *35 petitioners estimated what the "property was worth by itself"; that is, only the house and barn and what it would cost to replace them. While a combining of replacement cost and income methods may be appropriate in certain cases, the inexactitude with which it was applied here prevents us from overturning the presumed correctness of respondent's determination. Further, we find respondent's approach to be the best method, in this case, for determining the proper allocation of the purchase price between the depreciable and nondepreciable assets. As a consequence of improperly allocating the purchase price between the land and improvements, petitioners had claimed and been allowed excessive depreciation in earlier years and the years in issue. Respondent's determination of allowable depreciation for the years in issue corrects petitioners' error. The second issue before us is whether petitioners were entitled to deduct those expenses incurred during the first half of 1973 in preparation for the opening of a recreational vehicle campground, which was not open for business until late September 1973, as a business expense. In their reply brief petitioners all but concede that *36 the expenses claimed on their Schedule C in 1973 were not section 162 business expenses. Section 162 allows a deduction for all the "ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business". Clearly petitioners were not yet, if ever, in the "trade or business" of operating an RV campground at the time the claimed expenses were incurred and are thus not entitled to deduct such expenses under section 162.Expenses incurred in anticipation of engaging in a business at a future time are not deductible. Owen v. Commissioner,23 T.C. 377, 381 (1954). Petitioners argue on brief that, if the expenses are not deductible under section 162, then they are deductible under section 212 as expenses paid or incurred during the taxable year on property held for the "production of income". We believe this argument to be without merit. Petitioner-husband specifically testified that the expenses here in issue were expenses in connection with the development of the facilities for the RV park. He further testified that they were not in connection with the farm rental property. Further the RV campground was not rental property until *37 January 1974. While the property was apparently leased to the family corporation in 1973, rents were not charged during that year. Petitioners clearly had two separate activities occurring on the same piece of property.One part was the farm rental business and the second was the development of an RV park. The expenses here in issue, according to petitioner-husband's testimony and the evidence presented, clearly were connected with the development of the RV park. Accordingly, the expenses by petitioners are capital expenditures and thus not deductible. Respondent's determination as to this issue is sustained. The third and final issue presented is whether certain items installed for use in the RV campground by the petitioners qualify as section 38 property and are therefore entitled to the investment credit under that section. Property eligible for the investment credit is called "section 38 property" and is defined in section 48 (a) (1) (B) to include "other tangible property (not including a building and its structural components) but only if such property is used as an integral part * * * of furnishing transportation, communications, electrical energy, gas, water or sewage *38 disposal services * * *." Thus, the taxpayer must be in the trade or business of furnishing any such services before the property will qualify as section 38 property. Section 1.48-1 (d) (1), Income Tax Regs. Further, in order to qualify for the credit, the "other tangible property" must be an integral part of one or more of the activities specified above. Property such as pavements, parking areas, and inherently permanent advertising displays or lighting fixtures, or swimming pools, although ordinarily used in the operation of a business, is not an integral part of any such specified activities. Section 1.48-1 (d) (1) (4), Income Tax Regs.
Respondent's position is that providing electricity, water and sewage disposal services is part of a whole package or rights available to users of the campground and, therefore, petitioners are not in the separate business of furnishing utilities. Petitioners argue that, because of the unique requirements of an RV, the primary business of the campground is the furnishing of utilities. In reality petitioners are arguing that they have two separate businesses; that is, they are in the business of furnished electrical, gas, water and sewage services *39 to RV's and also the business of providing overnight campground facilities for the users of RV's. The test for determining whether a taxpayer is in a separate business of furnishing utilities as opposed to the utilities being incidental to, or an addition to, marketability of the primary business was set by this Court in Evans v. Commissioner,48 T.C. 704 (1967), affd. per curiam 413 F.2d 1047 (9th Cir. 1969). In Evans the taxpayers owned a mobile home park which included four utility systems for sewage disposal and for distribution of electricity, gas and water. The systems were connected into larger pubic utility systems and the taxpayers merely read meters, kept records, and billed the mobile home owners for the services used. The Court found that the taxpayers were not in a separate business of furnishing utilities because, from the stipulation of facts presented, the Court was unable to ascertain whether the taxpayers had substantial income from, or profit motive for, providing the utilities. The Court noted that it appeared the taxpayers may have been providing these services at cost and as such they were merely "incidental to the operation *40 of the park." Evans v. Commissioner,supra at 709. In determining whether the taxpayers were in a separate trade or business of furnishing utilities, the majority opinion established the following test: * * * in order to find that these activities constitute another trade or business of the petitioners, it would have to be shown that these activities earned a substantial amount of income, separate from the trailer park rental fees, and that there was a good faith intention of making a profit from them in and of themselves. [Evans v. Commissioner, supra at 709.] We find that petitioners have satisfied this test. The RV is used for both transportation and lodging. For short periods of time the vehicle is self contained. That is, it contains its own electrical, gas and water systems. Petitioners' facility provides water, sewer, gas and electrical services to these vehicles. For RV's just passing through there was a $2.00 charge for emptying waste and refilling the water tanks. If an RV stayed overnight there was a 50" charge for the use of electricity. The evidence showed that this resulted in a profit for each vehicle which used the *41 electricity.Further, if the RV owner wanted to use electricity for heating or air conditioning, there was an additional 50" charge. Because of the special type hook-ups necessary for these vehicles petitioners are more than mere conduits between the commercial supplier of electricity and the consumer. They are effectively the supplier of the utilities in the more commercial sense intended by section 48 (a) (1) (B). Respondent argues the fact that water and sewage service were included in a flat fee if the RV was staying overnight and the failure on the part of petitioners to maintain separate books for the utility services requires us to find that these activities are not separate businesses. We disagree. Petitioners have established that there was an intention to make a profit from each of these activities. A separate and complex bookkeeping system for each activity is not required so long as there was a profit element in each activity. The focus is on whether petitioners intended to make a profit from the sale of each utility service or whether they were merely incidental to the business of providing a campground for RV's. The fact that the $2 charge for use of the *42 sewage system and the right to refill the RV's water tanks was included in the overnight fee does not mean that petitioners did not make or intend to make a profit for providing the service.The water and sewage systems were established on petitioners' land and were not purchased utilities. While the amount of profit is uncertain, the $2 charge for sewage and water service to non-overnight users indicates that petitioners set the fee to generate a profit separate from the profit of the campground activity. Respondent also argues that the fact that almost every RV which stayed overnight used all the utility services is evidence that the services were incidental to the campground activity. We think that this further establishes that one of the primary uses of the campground was the providing of utilities. As previously noted, and RV is self-contained for a period of usually 2 or 3 days. Except when needing to regenerate its batteries, fill its water tanks or dump its waste, the RV can park on state provided roadways, parks, or even street curbs. Further, the average stay at the campground was 1.55 nights per RV which indicates that the clientele was transient in nature and primarily *43 used the campground as a means of reestablishing the RV's self-contained status. While petitioners were in the business of providing utility services, they also were in the campground business. This is evidenced from the other facilities and activities provided. For example, overnight campers could check out athletic equipment, obtain wood for campfires, play minigolf, go swimming, or set up tents and stay in the wilderness camping area of the campground. Respondent disallowed the investment credit claimed on the swimming pool, bath houses, and the fixtures and heater in the bath houses. As to these items, we agree with respondent. The swimming pool, bath houses and the structural components thereof are an integral part of the operation of the campground business. They are not an integral part of furnishing electrical energy, water or sewage disposal services within the meaning of section 1.48-1(d), Income Tax Regs. To reflect our conclusion with respect to the above issues, Decision will be entered under Rule 155.