**HUB CITY FOODS, INCORPORATED, Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 88–1848.

United States Court of Appeals, Seventh Circuit.

Argued June 16, 1989.
Decided Sept. 12, 1989.

Peter J. Lettenberger, Quarles & Brady, Milwaukee, Wis., Cameron W. Wolfe, Ruth L. Robinson, Michael A. Beckius, Orrick, Herrington & Sutcliffe, San Francisco, Cal., for petitioner-appellant.

Gary R. Allen, William S. Rose, Jr., Asst. Atty. Gen., Thomas R. Lamons, Tax Div., Appellate Section, Ann Belanger Durney, Dept. of Justice, Washington, D.C., for respondent-appellee.

Before POSNER, RIPPLE and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

Hub City Foods, Inc. (Hub City) appeals from a decision of the United States Tax Court disallowing a portion of an investment tax credit claimed by Hub City in its 1979 tax return.[1] Hub City claimed the investment tax credit under section 38 of the Internal Revenue Code of 1954, 26 U.S.C. § 38,[2] based upon the cost of a freezer facility that it built at its Marshfield, Wisconsin place of business. The Internal Revenue Service (IRS) allowed the credit to the extent that it was based on the costs of tangible personal property (refrigeration and electrical equipment) included in the freezer facility, but it disallowed that portion of the credit allegedly based on the costs of the structural components of the facility. Because a substantial portion of the claimed credit was disallowed, Hub City received a notice of deficiency from the IRS for the 1976 and 1977 income tax years. Hub City filed a petition in the United States Tax Court seeking a redetermination of the deficiency. The Tax Court upheld the decision of the IRS to disallow the claimed credit. This court has jurisdiction over Hub City's appeal pursuant to 26

---

1. Although the credit was claimed in 1979, it was carried back to the 1976 and 1977 tax years.

2. While section 2 of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085 (1986), redesignated the Internal Revenue Code of 1954 as the Internal Revenue Code of 1986, the taxable years and significant underlying events in this case antedate the Tax Reform Act of 1986. Unless otherwise noted, all references to the tax code in this opinion will be to the Internal Revenue Code of 1954.

U.S.C. § 7482(a). We now affirm the judgment of the Tax Court.

## I.

## Background

### A. *Facts*

Hub City is a wholesale distributor of grocery store items with its principal office and distribution center located in Marshfield, Wisconsin. Hub City purchases grocery items from various vendors, stores them at its distribution center, and then sells those items to retail outlets. Ninety-four percent of the items purchased by Hub City for resale are delivered to the distribution center by the vendors themselves or by common carriers. Hub City itself picks up from the vendors the remaining six percent of the items purchased for resale and transports them to Marshfield in its own trucks.

Almost all of the grocery items distributed by Hub City are delivered to retailers by Hub City in its own trucks; a few small retail outlets in the Marshfield area pick up their own purchases. In order to make its deliveries, Hub City maintains and operates a substantial fleet of trucks. In 1979, Hub City owned 20 semi-tractors and 33 semi-trailers and employed 12 full-time truck drivers who were members of the Teamsters Union. It also employed four full-time mechanics to service this equipment. These trucks logged over 694,000 miles in 1979. Hub City's trucking activities were subject to regulation by the U.S. Department of Transportation, the Interstate Commerce Commission, and the Wisconsin Department of Transportation. In addition, Hub City had authority from the ICC to operate as a common carrier. Hub City did in fact sometimes operate its trucks as a common carrier, transporting goods owned by third parties to locations designated by those third parties. The transportation of these goods was regulated by the Interstate Commerce Act. However, Hub City primarily uses its trucks to deliver to retailers products that it is selling to them. Moreover, none of the goods transported by Hub City as a common carrier were stored in the freezer facility at issue in this case.

Hub City charged retailers a set percentage mark-up over its own cost for products that it sold to them. This mark-up varied, depending on the dollar volume of the retailers' purchases and the distance from the Marshfield distribution center to the particular retail outlet. Hub City also charged a flat twenty-dollar fee (a "stop charge") for each delivery made to a particular location. *See* R.7 at 4–5; Ex. 5–E.

In 1979, Hub City's total sales of grocery items exceeded $34,000,000. Approximately $1,800,000 of these sales consisted of sales of frozen products. In order to prevent the spoilage of frozen food between the time it was received from vendors and the time it was delivered to retail outlets, Hub City needed a freezer facility at its distribution center. In 1979, after a freezer facility built in 1973 experienced floor buckling problems, Hub City built a new freezer facility. This facility covered more than 25,000 square feet and included a freezer area, loading dock, and other ancillary work space. The cost of the entire freezer facility was $1,388,339. The IRS allowed over $386,000 of this cost (attributable to refrigeration equipment and electrical work) to be used in computing Hub City's investment tax credit. The remaining cost was disallowed, and the portion allocable to the freezer area itself, $841,666, is in dispute in this case.[3]

### B. *Applicable Statutory and Regulatory Scheme*

Sections 38 and 46 of the Internal Revenue Code of 1954[4] provided for a credit

---

**3.** Hub City conceded in the Tax Court that it was not entitled to the tax credit for the loading dock and other ancillary work space.

**4.** Section 38 provided a tax credit for "investment in certain depreciable property":

    (a) General Rule.—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under [section 46].

    (b) Regulations.—The Secretary shall prescribe such regulations as may be necessary

against income tax based on a percentage of a taxpayer's investment in "section 38 property." Section 48(1) defines the term "section 38 property" to include:

(A) tangible personal property (other than an air conditioning or heating unit), or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

(ii) constitutes a research facility used in connection with any of the activities referred to in clause (i), or

(iii) constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities....

26 U.S.C. § 48(a)(1)(A) & (B). Because Hub City's freezer facility was not tangible personal property, the dispute centers on whether the freezer area constitutes tangible property used as an integral part of furnishing transportation services.[5]

Treasury Regulation § 1.48 further refines the definition of section 38 property. Before a taxpayer can claim a credit for tangible personal property used as an integral part of furnishing transportation services, it must establish that it is a "person engaged in [the] trade or business of furnishing [transportation] service." Treas. Reg. § 1.48–1(d)(1); *see also* H.R.Rep. No. 1447, 87th Cong., 2d Sess. (1962), *reprinted in* 1962–3 C.B. 503, 516; S.Rep. No. 1881, 87th Cong., 2d Sess. (1962), *reprinted in* 1962–3 C.B. 707, 859 ("Property is to be considered as being used as an integral part of a system of furnishing transportation ... services *only* if such property is

used by one engaged in the trade or business of furnishing such services.") (emphasis supplied). The regulation further explains that "[e]xamples of transportation businesses include railroads, airlines, bus companies, shipping or trucking companies, and oil pipeline companies." Treas.Reg. § 1.48–1(d)(3). Finally, the regulation notes that "[p]roperty is used as an integral part of one of the specified activities if it is used directly in the activity and is essential to the completeness of the activity." Treas.Reg. § 1.48–1(d)(4).

### C. *Opinion of the Tax Court*

The Tax Court concluded that Hub City's freezer facility did not qualify as section 38 property as defined by section 48 of the Interral Revenue Code and the applicable Treasury Regulation and therefore upheld the decision of the IRS to disallow the investment tax credit claimed by Hub City. The court explained that Hub City's activity of transporting its own goods to retailers was "purely incidental to its primary business of providing grocery items to retailers, and a service that is incidental to and only a part of a taxpayer's primary business does not constitute a separate trade or business for purposes of section 1.48–1(d)(1), Income Tax Regs." *Hub City Foods, Inc. v. Commissioner*, 90 Tax Court Reports No. 23 (CCH) 2744, 2746 (1988) (citing *Mt. Mansfield Co. v. Commissioner*, 50 T.C. 798, 800–01 (1968), *aff'd*, 409 F.2d 845 (2d Cir.1969) (per curiam)). The court reasoned that Hub City's activity of transporting its own goods, rather than goods owned by third parties, did not constitute a separate business of furnishing transportation.

Moreover, the court concluded that, even if Hub City's activities could be characterized as a transportation business, the freez-

---

to carry out the purpose of this section and [section 46].

Pub.L. No. 87–834, 76 Stat. 962–63 (1962), *as amended by* Pub.L. No. 94–455, 90 Stat. 1834 (1976). Section 46 established the amount of the credit as a specified percentage of a qualified investment in "section 38 property" as defined in section 48. *See* Pub.L. No. 87–834, 76 Stat. 963–64 (1962). The investment tax credit established by section 38 was repealed by Pub.L.

No. 98–369, Div. A, Title IV, § 474(m)(1), 98 Stat. 833 (1984).

5. The IRS also contends that the freezer area is a building or a nonqualified storage facility for investment tax credit purposes. The Tax Court did not reach these arguments and, because we agree with the holding of the Tax Court, we also find it unnecessary to reach them.

er facility was not used as an integral part of "furnishing transportation." The court reasoned that Hub City's use of the freezer facility simply to store grocery items until they were sold to retailers was not an integral part of "furnishing transportation."

In a motion for reconsideration, Hub City argued that its transportation activities constituted a trade or business under other sections of the Internal Revenue Code. In response, the Tax Court explained that "the issue in this case is not whether petitioner's activity of delivering its own goods to customers qualifies as a trade or business [under other code sections]. Rather, the issues are whether such activity qualifies as a 'transportation business' within the meaning of section 48 and the regulations thereunder and, if so, whether the freezer facility was used directly in that activity." R.17 at 2. Because Hub City's activities did not constitute a "commonly accepted" transportation business like those listed in the applicable Treasury Regulation (railroads, airlines, bus companies, shipping or trucking companies, and oil pipeline companies), the court was not persuaded to modify its original holding.

## II.

### Analysis

◼ Hub City bears the burden of proving that it is entitled to the investment tax credit that it claimed. *See McManus v. United States*, 863 F.2d 491, 494 (7th Cir. 1988). Under the applicable statutory and regulatory scheme, Hub City must satisfy two criteria in order to demonstrate that its freezer facility qualifies as section 38 property capable of serving as the basis for computing an investment tax credit. First, Hub City must show that it is engaged in the trade or business of furnishing transportation services. *See* Treas.Reg. § 1.48–1(d)(1). Second, Hub City must show that its freezer facility "is used as an

integral part of ... furnishing transportation ... services." 26 U.S.C. § 48(a)(1)(B)(i). The Tax Court concluded that Hub City failed to satisfy both of these criteria. We agree.

### A. *"Trade or business of furnishing transportation services"*

Hub City argues at some length that, under various sections of the Internal Revenue Code, it is engaged in a "trade or business." *See* Appellant's Br. at 22–35 (citing sections 55, 62, 162, 172, 280A, and 355 of the Internal Revenue Code). In the course of this argument, Hub City asserts that, in light of its trucking activities, "[s]uch trade or business can *only* be considered the trade or business of furnishing transportation." *Id.* at 26 (emphasis supplied). However, as the Tax Court correctly explained, there is no dispute that Hub City is engaged in some sort of trade or business. The question on appeal is how to characterize that trade or business: are Hub City's activities involving the freezer solely the activities of a wholesale grocery distributor or is it engaged in two separate and distinct trades or businesses—grocery wholesaler *and* trucking company? [6]

### 1.

◼ We turn first to the case law. While the Tax Court has recognized that a taxpayer can be engaged in more than one trade or business, *see Evans v. Commissioner*, 48 T.C. 704, 708 (1967), *aff'd*, 413 F.2d 1047 (9th Cir.1969), it is also clear that Congress did not intend that every service performed by a taxpayer would constitute a separate trade or business for the purpose of investment tax credit computations. *See Mt. Mansfield Co. v. Commissioner*, 50 T.C. 798, 801 (1968); *Evans*, 48 T.C. at 708–09. Thus, in determining the nature of the trade or business in which a taxpayer is engaged for purposes of the investment tax credit, we must distinguish between a

---

**6.** As previously noted, Hub City does in fact sometimes serve as a trucking company acting as a common carrier transporting third parties' goods. None of these third-party goods, however, were ever stored in the Marshfield freezer facility at issue in this appeal. *See* R.7 at 13 (Stipulation of Fact 29) ("No goods belonging to third parties were stored in the freezer facility....").

taxpayer's "real" or primary business and activities that are merely incidental to or supportive of the operations of that primary business. *See Evans*, 48 T.C. at 708; *see also Mt. Mansfield Co.*, 50 T.C. at 800–01 ("[A] service which is incidental to and only a part of a taxpayer's primary business does not and should not constitute a separate trade or business" for purposes of investment tax credit analysis.). Therefore, where the operation of a taxpayer's primary business requires the taxpayer to provide certain services to customers, the activity of providing each of those services does not automatically constitute a trade or business distinct from the taxpayer's primary business. For example, the provision of utility services to home sites in a mobile home park does not mean that the taxpayer is in the business of furnishing utility services when, "[a]t most, these activities would only contribute to the marketability of sites in the trailer park." *Evans*, 48 T.C. at 709. Similarly, the fact that a taxpayer arguably furnishes transportation services (ski slopes and trails) as part of its business does not mean that the taxpayer is in the business of furnishing transportation services. *See Mt. Mansfield Co.*, 50 T.C. at 800 ("Any such services that petitioner provided are purely incidental to its trade or business of providing recreational facilities.").

■ The Tax Court has noted that, when determining whether a taxpayer's secondary activities constitute a separate trade or business, it is appropriate to apply a "pragmatic and businessman's standard." *Grow v. Commissioner*, 80 T.C. 314, 322 (1983). When applying this standard, we consider "whether the allegedly separate trade or business is structured so as to stand on its own feet financially and yield a reasonably predictable positive cash flow." *Id.; see also Hayden Island, Inc. v. United States*, 380 F.Supp. 96, 98–99 (D.Ore.1974) (for an activity to be a trade or business, "there must be an actual, good faith, intent to

profit"); *Evans*, 48 T.C. at 709 ("[I]n order to find that these activities constitute another trade or business of the [taxpayer], it would have to be shown that these activities earned a substantial amount of income, separate from the [income generated by the taxpayer's primary business], and that there was a good faith intention of making a profit from them *in and of themselves*.") (emphasis supplied).

In cases where the Tax Court has concluded that the taxpayer is engaged in more than one trade or business, the taxpayer has been able to demonstrate that it is somehow operating its secondary business in a manner distinct from that of its primary business. For example, in *Grow*, the Tax Court noted that, prior to purchasing a mobile home park, the taxpayer had performed "a careful analysis to determine whether a substantial profit could be made from providing water and sewer services." 80 T.C. at 323. In addition, "[t]he fact that the [taxpayer] took careful steps to segregate the operation of the mobile home park from the operation of the water and sewer facilities" indicated that the taxpayer intended to profit from offering the utility services. *Id.*[7] Similarly, in *Westroads, Inc. v. Commissioner*, 69 T.C. 682, 688–89 (1978), the court held that the taxpayer, a shopping center developer, was engaged in the separate business of providing electrical energy to its shopping center tenants. The taxpayer had installed generating equipment in the shopping center in order to provide electricity to its tenants. The court found that the decision to install this equipment was not motivated by reasons of convenience or lack of available public power, but by the desire to make a profit. Moreover, the court concluded that the taxpayer's "trade or business included the production of electrical energy *for sale*. The generation of electricity for sale to tenants is not the customary role of the landlord...." 69 T.C. at 688–89. Because, under these circumstances, the taxpayer

---

7. *See also Graybeal v. Commissioner*, 39 T.C.M. 734, 739–40 (CCH) (1979) ("A separate and complex bookkeeping system for each activity is not required so long as there was a profit element in each activity. The focus is on whether petitioners intended to make a profit from the sale of each utility service or whether they were merely incidental to the business of providing a campground for RV's.").

was in the business of furnishing electrical energy for sale, the court held that the electrical generating equipment qualified as section 38 property.

### 2.

■ It is apparent that Congress intended that a limited definition should be given to the term "business of furnishing transportation services." *See Mt. Mansfield Co. v. Commissioner,* 50 T.C. 798, 802 (1968). The legislative history accompanying the statutory provision defining section 38 property explains that the term "business of furnishing transportation services" is to be given its "commonly accepted" meaning. *See* H.R.Rep. No. 1447, 87th Cong., 2d Sess. (1962), *reprinted in* 1962–3 C.B. 503, 516; S.Rep. No. 1881, 87th Cong., 2d Sess. (1962), *reprinted in* 1962–3 C.B. 707, 859. Moreover, the committee reports cite "railroads and airlines" as examples of transportation businesses. *Id.* The Treasury Regulation applicable to the definition of section 38 property adds to airlines and railroads, "bus companies, shipping or trucking companies, and oil pipeline companies." Treas.Reg. § 1.48–1(d)(3). These examples, "while not exclusive, circumscribe and are indicative of the types of businesses that are 'commonly accepted' as transportation businesses." *Mt. Mansfield Co.,* 50 T.C. at 802. The Tax Court in *Mt. Mansfield Co.* also noted that Congress only made the investment tax credit available "to certain kinds of businesses and did not include all businesses which might fulfill the general purposes for which the investment credit provisions were enacted." *Id.* at 803. While the credit was extended to businesses furnishing transportation services, Congress did not extend the credit to businesses engaged in the wholesale distribution of grocery items. As the IRS suggests in its brief, if any business that sells its own goods and, as a service to its customers delivers those goods to the customer's place of business, were qualified for the investment credit, the "trade or business" requirement established by the Treasury Regulations effectively would be nullified. *See* Appellee's Br. at 25 n. 18. Such a result would ignore the "restrictions that

Congress saw fit to impose on [the investment tax credit] provisions." *Mt. Mansfield Co.,* 50 T.C. at 803. Accordingly, we agree with the Tax Court in *Mt. Mansfield Co.,* that "not every business which in some loose sense might be considered to be a transportation business should be so considered for purposes of [defining section 38 property]." 50 T.C. at 802.

### 3.

■ Merely because a taxpayer is treated as a common carrier for some purposes does not mean that it is engaged in the business of furnishing transportation services for investment tax credit purposes. For example, in *Mt. Mansfield Co.,* the taxpayer, a ski resort operator, noted that it was treated as a common carrier under Vermont law for the purpose of determining the standard of care it must exercise in the operation of its chair lift. *See* 50 T.C. at 802. This fact, however, did not persuade the Tax Court that the taxpayer was in the business of furnishing transportation services for the purpose of claiming a tax credit on its investment in slopes and trails. *Id.*

### 4.

■ In light of these principles, we conclude that Hub City has failed to demonstrate that it is engaged in the business of furnishing transportation services. Instead, we believe that Hub City's trucking activities are more accurately characterized as activities incidental to, or in support of, its primary business of wholesale grocery distributing. Hub City undoubtedly uses its extensive fleet of trucks to deliver its goods to its customers as a service to those customers and, as in *Evans,* to increase the "marketability" of its own grocery distribution business.

Moreover, Hub City has not demonstrated that it conducts its trucking operations as a business separate from its primary business of grocery distribution. Hub City has not shown that it derives substantial income from its trucking activities alone, separate from its distribution of groceries, or that it seeks to derive profits from its

trucking activity *in and of itself*. In addition, the trucking activities at issue in this case do not appear to have been structured in such a way that they stood on their own feet financially and yielded a "reasonably predictable positive cash flow." *See Grow*, 80 T.C. at 322. Instead, the cost of the trucking activity involved in the distribution of groceries was factored into the mark-up that Hub City used in determining *the price of its grocery items*. While the mark-up used by Hub City generally increased by an average of 0.1% for each ten miles of distance that Hub City's trucks were required to travel between its distribution center and its customer's location, *see* Ex. 5–E at 2, Hub City has not demonstrated that this variable mark-up was designed to produce a transportation-related profit. Rather, the changes in the mark-up appear to compensate Hub City for the increased cost of transportation over a greater distance. In sum, Hub City's trucking activities were not carried on as a business separate from Hub City's primary business of grocery distribution.

In addition, characterizing Hub City as a person engaged in the trade or business of furnishing transportation services detracts from Congress' attempt to limit the investment tax credit to certain specific types of businesses. The grocery distribution business is not one of the statutorily identified businesses that Congress sought to promote through enactment of the investment tax credit provisions. If, merely by using its own trucks to deliver its own goods, a taxpayer could qualify as a transportation business, the statutory and regulatory limits on the sort of businesses eligible for the tax credit would be weakened. Congress sought to aid businesses that are "commonly accepted" as transportation businesses. A grocery wholesaler, however, that delivers its own goods in its own trucks hardly provides the same sort of transportation services as does an airline, a railroad, or a trucking company actually serving as a common carrier. Thus, Hub City is not the sort of entity that is "commonly accepted" as a transportation business.

Finally, as suggested in *Mt. Mansfield Co., supra*, the mere fact that Hub City's trucking activities are subject to various state and federal transportation regulations does not automatically make it a participant in the transportation business. We, therefore, conclude that Hub City has failed to establish that it is engaged in the trade or business of providing transportation service.

B. *Use of freezer facility as an "integral part" of providing transportation services*

■ Even if we assume that Hub City is in the business of providing transportation services, we do not believe that its freezer facility can be characterized as an "integral part" of furnishing those services. Hub City has not demonstrated that the Marshfield freezer facility is "used directly" in the transportation activity or is in any way "essential to the completeness of [that] activity." Treas.Reg. § 1.48–1(d)(3). The freezer has nothing to do with moving Hub City's goods safely and efficiently from its distribution center in Marshfield to its customers' places of business.[8] Rather, Hub City built the freezer so that its goods would not spoil during the period of time *before* they were put on the trucks and transported to its customers. Indeed, Hub City would have needed to store its frozen goods in some sort of freezer facility even if it made no deliveries and all of its customers came to the distribution center and picked up their own orders. Moreover, Hub City had refrigerated trucks that protected the frozen food while it was being transported. Thus, while a freezer built to ensure that Hub City would not be selling spoiled food to its retail customers is clearly an integral part of its primary activity of wholesale grocery distribution, it is not integral to any transportation services involved in the delivery of those grocery items. *See also Commissioner v. Schuyl-*

---

**8.** *Cf. Southern Pac. Transp. Co. v. Commissioner*, 90 Tax Court Reports No. 51 (CCH) 2977, 2984 (1988) (overpass, used by the public, was integral part of railroad's transportation business because it "enable[d] [the railroad] to operate its trains in a safer and more efficient manner").

*er Grain Co.*, 411 F.2d 649, 652 (7th Cir. 1969) (court found "little support in arguing" that concrete storage bins used by taxpayer involved in the harvesting, storing, processing, manufacturing, and transporting of grain "may be said to have been used in connection with 'furnishing transportation' ").

In support of its contention that the freezer facility was used as an integral part of furnishing transportation services, Hub City cites *Spartanburg Terminal Co. v. Commissioner*, 66 T.C. 916 (1976), and *Yellow Freight System, Inc. v. United States*, 413 F.Supp. 357 (W.D.Mo.1975), *rev'd on other grounds*, 538 F.2d 790 (8th Cir.1976). These cases, however, are inapposite. In *Spartanburg Terminal Co.*, the taxpayer, a railroad, built fences and gates around a railroad tunnel project in downtown Spartanburg, South Carolina. The Tax Court held that the fences and gates were an integral part of furnishing transportation since they were designed to keep people from wandering into the railroad tunnel and its access tracks. The court explained that "public safety is, and should be, as much an essential element in *operating* this particular railroad tunnel as the railroad tracks themselves." 66 T.C. at 939 (emphasis supplied). Hub City's freezer facility has no such essential relationship to the operation of its trucking activities.

In *Yellow Freight System*, a trucking company *acting as a common carrier* built a chain link fence around each of its terminals. The company's loading docks are located at these terminals. Shippers using the trucking company to transport *their goods* delivered those goods to the company's terminal. Those goods were then loaded on the company's trucks. In order to prevent the freight delivered to it by various shippers from being stolen while it was being stored in the terminal, the company built the fences. Because the fences were built for this purpose, the court concluded that "the taking of reasonable precautions to prevent loss or damage to freight is an essential element of the business of transporting goods, no less than the actual movement of the goods." 413 F.Supp. at 371. It was important for the company to prevent theft in order to preserve its reputation for reliability of service. Thus the fences were an integral part of the company's business of furnishing transportation services. By contrast, Hub City is not a common carrier with respect to the goods stored in its freezer facility. Hub City stores *its own goods* in the freezer facility prior to delivering them to its customers. As previously noted, Hub City would need the freezer facility even if it provided no transportation services and its customers were required to come to its distribution center to pick up their frozen food orders. Therefore, Hub City needs the freezer facility to preserve its reputation as a reliable wholesaler of grocery items, not to preserve its reputation for good transportation service. Hub City's refrigerated trucks themselves keep the frozen food from spoiling when Hub City is acting as a provider of transportation service.

### Conclusion

The judgment of the Tax Court is affirmed. For purposes of determining its eligibility for the tax credit in question, Hub City is not an entity engaged in the business of furnishing transportation services as that business is commonly understood. Rather, it is a grocery wholesaler. Moreover, even if we assume Hub City is in the business of providing transportation services, the freezer facility is not an integral part of that activity. Therefore, the Tax Court properly concluded that Hub City was not entitled to an investment tax credit based on the cost of constructing its freezer facility.

AFFIRMED.