ROBERT PRESTON and VELDA LEE PRESTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; SPADE OPERATING CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Preston v. Commissioner
Docket Nos. 7991-81, 7992-81.
United States Tax Court
T.C. Memo 1985-463; 1985 Tax Ct. Memo LEXIS 165; 50 T.C.M. (CCH) 963; T.C.M. (RIA) 85463; September 4, 1985. *165 P was in the oil business, and during the years at issue, he failed to report substantial amounts of income. X was a corporation wholly owned and controlled by P, and during the years at issue, it failed to report substantial amounts of income. During the Commissioner's investigation of the income tax liabilities of P and X, P was almost entirely uncooperative. Held: (1) Deficiencies in income tax for 1976 and 1977 as to P, and as to X for its 1974 and 1975 taxable years, sustained. (2) Additions to tax under sec. 6653(b), I.R.C. 1954, for fraud as to both P and X sustained. (3) Addition to tax under sec. 6655, I.R.C. 1954, for failure to pay estimated tax as to X sustained. Ray E. Green, for the petitioners. Donna K. Robason, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: Additions to Tax
Taxable Year
Sec. 6653(b)
Sec. 6655
Petitioner
Ended
Deficiency
I.R.C. 1954 [1]
I.R.C. 1954
Robert Preston
12/31/76
$36,895.60
$23,219.29
and Velda
12/31/77
9,342.61
4,671.31
Lee Preston
Spade
11/30/74
$34,619.23
$29,938.89
$1,608.86
Operating
11/30/75
8,607.85
4,303.93
122.02
Co.
*166 In the notices of deficiency, the Commissioner conceded that Mrs. Preston was not liable for the addition to tax under section 6653(b) for fraud. However, he claimed that if the Court should find that Mr. Preston was not liable for the addition to tax under section 6653(b) for fraud, Mr. and Mrs. Preston were liable for the additions to tax under section 6651(a)(1) for failure to file a timely return for 1976 and under section 6653(a) for negligence or intentional disregard of rules and regulations for 1976 and 1977, and that if the Court should find that Spade Operating Co. is not liable for the addition to tax under section 6653(b) for fraud, it is liable for the additions to tax under section 6651(a) for failure to file timely returns and under section 6653(a) for negligence or intentional disregard of rules and regulations. The issues for decision are: (1) Whether Mr. and Mrs. Preston are liable for the deficiencies in income tax for 1976 and 1977 as determined by the Commissioner; (2) whether Mr. Preston is liable for the addition to tax for fraud under section 6653(b) for 1976 and 1977; (3) if Mr. Preston is not liable for such addition, whether Mr. and Mrs. Preston are liable *167 for the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations for 1976 and 1977 and for the addition to tax under section 6651(a)(1) for failure to timely file a tax return for 1976; (4) whether Spade Operating Co. is liable for the deficiencies in income tax for its taxable years ended November 30, 1974, and November 30, 1975, as determined by the Commissioner; (5) whether Spade Operating Co. is liable for the addition to tax for fraud under section 6653(b) for such taxable years; (6) if Spade Operating Co. is not liable for such addition, whether it is liable for the addition to tax under section 6651(a) for failure to file tax return or to pay tax for such years and for the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations for such years; and (7) whether Spade Operating Co. is liable for the addition to tax under section 6655 for failure to pay estimated income tax for such years. FINDINGS OF FACT None of the facts have been stipulated, but some of the facts have been deemed *168 established under Rule 91(f), Tax Court Rules of Practice and Procedure.[2]
During the years 1974 through 1977, the petitioners, Robert and Velda Lee Preston, were husband and wife and resided in Abilene, Tex. At the time they filed their petition in this case, Mr. Preston resided in Abilene, Tex., and Mrs. Preston resided in Lake Orion, Mich.
Spade Operating Co. (Spade) was incorporated under the laws of Texas on January 23, 1973, and its certificate of incorporation was forfeited by the Texas Secretary of State on March 21, 1977, for failure to pay franchise tax. During its existence, Spade's principal place of business was in Abilene, Tex., and Mr. Preston was its president and sole shareholder. Mr. and Mrs. Preston filed their Federal income tax returns for 1976 and 1977 with the Internal Revenue Service. Their 1976 return was received by the IRS on January 27, 1978, and their 1977 return was received by the IRS on June 19, 1978. Such returns were filed after Mr. Preston was contacted by a revenue officer in the Abilene IRS office who requested that he file returns for 1976 and 1977. Their 1975 return *169 was also filed late; it was received by the IRS on September 23, 1977. Spade did not file Federal income tax returns for its taxable year ended November 30, 1974, or its taxable year ended November 30, 1975. It also did not file returns for its taxable year ended November 30, 1976, or its taxable year ended November 30, 1977. It did file a corporate income tax return for the taxable period beginning January 23, 1973, and ending November 30, 1973, with the Internal Revenue Service Center, Austin, Tex. We will refer to a taxable year of Spade by the calendar year in which it ended. Revenue Agent Foy Allcorn was assigned to audit the Prestons' income tax returns for the years 1974 through 1977 and to compute the tax liabilities of Spade for the same years. The investigation was begun as a result of information received from revenue agents in California concerning an allegedly abusive tax shelter that was making payments to Mr. Preston and Spade. On October 20, 1978, Agent Allcorn first tried to contact Mr. Preston by repeatedly calling the telephone number listed in the Abilene telephone directory for Robert Preston. The same telephone number was also listed as the number for Spade. *170 At that time, no one answered the telephone. A few days later, Agent Allcorn called Mel Holt, who had signed the Prestons' 1976 tax return as the preparer of that return. Agent Allcorn left word for Mr. Holt to have Mr. Preston contact him if Mr. Holt spoke to Mr. Preston. On October 27, 1978, and on October 31, 1978, Agent Allcorn again tried repeatedly without success to reach Mr. Preston at the number listed for him and Spade. On February 21, 1979, Agent Allcorn did reach someone at the number listed for Mr. Preston and Spade, and that person told him that she would have Mr. Preston call Agent Allcorn later that day. Mr. Preston did not return Agent Allcorn's call, and the next day, Agent Allcorn mailed appointment letters to Mr. Preston and to Spade setting up examination appointments for March 5, 1979. Agent Allcorn received no response to the appointment letters from Mr. Preston or Spade. Mr. Holt did call Agent Allcorn and told him that he intended to get a power of attorney and that he had some records that might be pertinent to the agent's examination. On March 14, 1979, Mr. Holt again called Agent Allcorn and told him that he had contacted Mr. Preston and that Mr. *171 Preston had indicated that he would execute a power of attorney for Mr. Holt. Two days later, Agent Allcorn received the records that Mr. Holt had referred to earlier. The records consisted of certain piecemeal bank statements and an incomplete worksheet; Mr. Holt did not send Agent Allcorn a power of attorney from Mr. Preston or Spade. Thereafter, until sometime in early 1980, Agent Allcorn served summonses with respect to all known bank accounts of Mr. Preston and Spade, and he interviewed and obtained information from third parties in order to, in effect, reconstruct a set of records for Mr. Preston and Spade. On February 26, 1980, Agent Allcorn again tried to reach Mr. Preston. A new phone book contained a listing for Robert Preston Oil Operator, and it also listed a residential number for Robert Preston at Fort Phantom Lake in Abilene. When Agent Allcorn called the number for Robert Preston Oil Operator, an answering machine indicated that Mr. Preston was out and that if the caller would leave his name and number, Mr. Preston would call back. Agent Allcorn left his name and number on the machine, but Mr. Preston never returned his call. When Agent Allcorn tried the residential *172 number, he was informed that it had been changed and that the new number was the same as the number for Robert Preston Oil Operator. On February 29, 1980, Agent Allcorn tried again to call the number for Robert Preston Oil Operator but got no answer. On March 3, 1980, Agent Allcorn prepared a summons for Mr. Preston to appear before him and produce information with respect to his tax returns. From March 4 until March 12, 1980, Agent Allcorn tried extensively to serve the summons. In the course of trying to serve the summons, Agent Allcorn found out that Mr. Preston no longer had an office where previously he had maintained one. Agent Allcorn also visited the cabin at Fort Phantom Lake supposed to be Mr. Preston's and found no one there. In addition, Agent Allcorn checked with the Post Office and with the Texas Railroad Commission to see if they had a new address for Mr. Preston, but they did not. On March 12, 1980, Agent Allcorn again called the number listed for Robert Preston Oil Operator and left his name and number on the answering machine. Having completed his audit of the Prestons and Spade, Agent Allcorn sent a draft copy of his report to Mr. Preston, requesting that he *173 review it and that if he had any questions or objections, he forward any additional information he might have to Agent Allcorn by April 30, 1980. Finally, on April 21, 1980, Mr. Preston called Agent Allcorn and told him that he was reviewing the report and that he would contact the agent by April 30 if he had any additional information. This was the first time that Agent Allcorn had spoken to Mr. Preston. Thereafter, Mr. Preston called Agent Allcorn again and objected to the agent's treatment of transfers of funds between Spade and Mr. Preston. In his draft report, Agent Allcorn treated certain transfers from Spade to Mr. Preston as dividends, and he treated transfers from Mr. Preston to Spade as contributions to capital. Mr. Preston contended that these transfers were loans and repayments of loans. Subsequently, Agent Allcorn changed his report and treated transfers between Spade and Mr. Preston as loans and repayments of loans with the exception of certain amounts that Mr. Preston had reported on his Schedule C as field supervision income. Amounts so reported were treated by Agent Allcorn as income to Mr. Preston and as deductible by Spade. On April 30, 1980, Mr. Preston called *174 Agent Allcorn and said that he needed more time to look over the report. On May 4, 1980, Mr. Preston called again to say he was still looking over the report. On May 15, 1980, Agent Allcorn received a letter from Mr. Preston that, in general terms, contended that Agent Allcorn had not allowed Spade sufficient deductions and had incorrectly attributed income to Spade and to Mr. Preston. The letter also protested the fact that Agent Allcorn had not allowed statutory depletion. In his corrected report, Agent Allcorn took what he termed "a liberal approach" and allowed a deduction for statutory depletion. On July 1, 1980, Agent Allcorn called Mr. Preston to discuss his corrected report and left a message on the answering machine for Mr. Preston to call him. On September 8, 1980, having not heard from Mr. Preston, Agent Allcorn closed the case as unagreed. During Agent Allcorn's investigation, Mr. Preston did not provide him with any books and records or other documentation concerning his tax liabilities or that of Spade. In making his determinations with respect to the income tax liabilities of the Prestons and Spade, the agent relied primarily on the records that he received as *175 a result of the summonses which he had served on banks, as well as on information that he received from various third parties. From those records, he constructed a schedule of receipts and disbursements. Agent Allcorn used the notations on the deposit slips and on the checks to determine whether a particular item should be treated as income to the Prestons or Spade or should be allowed as a deduction. Where a notation was unclear or where he could not determine whether an item should be treated as income or a deduction, he treated such item, if it was a deposit slip, as a non-income item, or if it was a check, as a deductible item. In the course of his investigation of the Prestons and Spade, Agent Allcorn also examined certain records concerning two trust accounts. One trust account was set up by Spade and Bridge Oil Company. A second trust account was set up with funds contributed by Spade and Pima Oil Company (Pima). Spade had entered into an agreement with Pima to perform certain drilling work. At some point, Pima became concerned that the drilling work was not being done as it was supposed to have been. Subsequently, the trust account was set up, and thereafter, when *176 Spade certified to the bank at which the trust account had been set up that certain drilling work had been completed, the bank disbursed funds to Spade. Pima was organized in 1973. Nelson Quinn, an attorney representing Mr. Preston, approached McElton Skaggs to be the president of Pima, and Mr. Skaggs agreed. Mr. Skaggs, or Mr. Skaggs and his wife, owned all of the stock of Pima. Pima was to enter into agreements with tax shelter investors who held oil and gas leases. Pima then subcontracted the drilling and operation of wells to Spade which was supposed to do the actual drilling and operate the wells. As originally conceived, Mr. Skaggs was to have nominal responsibilities. The oil and gas leases were originally acquired by Mr. Preston, who then sold them to the investors. As part of the agreement between Pima and an investor, the investor sent Pima two checks. One check represented the investor's actual cash investment. The other check, which was for two or three times the amount of the investor's cash investment, represented the proceeds from a loan taken out at a bank in Abilene. The loan proceeds were then invested in certificates of deposit which remained at the lending *177 bank, along with the oil and gas leases, as collateral for the loan. The interest paid on the certificates of deposit was 2 percent less than the interest charged on the loan. These transactions were designed to generate deductions for the investors in excess of their cash investment. The money not invested in certificates of deposit or needed to pay the 2 percent interest differential for the loans and certain other expenses was paid to Spade or Mr. Preston before drilling work was actually performed. The certificates of deposit were for a term of 9 months. After the certificates of deposit matured, Pima cashed them and then wrote a letter to the individual investor telling him that Pima was not satisfied with how work was progressing and offered to pay off the amount of the note in exchange for a one-half interest in the oil and gas lease held by the investor. At some time thereafter, Pima declared bankruptcy and sold its interest in the oil and gas leases to either Mr. Preston or Spade. After certain expenses were paid and Pima paid the agreed amount to Mr. Skaggs, all of the money paid by the investors to Pima was either paid to Spade or put into the Pima-Spade trust account. *178 Mr. Preston was the originator of this oil and gas tax shelter, and he was knowledgeable about the tax consequences of the arrangements. The investors' primary reason for investing in this tax shelter was the projected favorable tax consequences. Although Spade was paid in advance to drill the wells, it did not actually drill all the wells that it was supposed to drill. When Mr. Skaggs became aware of the fact that Spade was not doing the drilling that it had agreed to do, he became concerned. As a result, he stopped turning over investors' money to Spade, and the Pima-Spade trust account was set up. Pima contributed to the trust account the investors' money that it had; Spade contributed certain money that it had not spent, as well as certain equipment. Eventually, in 1982 or 1983, the funds still remaining in the trust account were distributed. Agent Allcorn treated contributions to the Pima-Spade trust account by Spade as if they were simply transfers from one bank account to another, and thus not taxable. He included in Spade's income the payments made to it from the Pima-Spade trust account for work that had been completed to the extent that the payments were from funds *179 contributed to the trust account by Pima. The balance in the trust account was always in excess of the amount that Spade had contributed to it. Agent Allcorn did not treat as income drilling payments from the Pima-Spade trust account that represented funds originally contributed to the trust account by Spade. Agent Allcorn's investigation disclosed that during 1976 the Prestons received income of $68,791.44 from the various business activities of Mr. Preston, as well as interest income of $952.97, which they failed to report on their income tax return for that year. For 1977, the agent's investigation disclosed that the Prestons received income of $13,110.45 from the business activities of Mr. Preston, and interest income of $1,531.11, which they failed to report on their 1977 return. With respect to Spade, Agent Allcorn's investigation disclosed the following: Drilling Income
Deductible Costs,
Taxable
and Operating
Refunds, and
Interest
Year Ended
Receipts
Expenses
Income
11/30/74
$368,982.00
[3] *180 $237,458.26
$6,763.30
11/30/75
240,501.81
200,773.79
11/30/76
104,000.00
144,010.17
11/30/77
32,959.79
60,929.30
1,093.10
In his notice of deficiency to the Prestons, the Commissioner determined that they had underreported their taxable income for 1976 and 1977 in the amounts determined by Agent Allcorn's investigation. In making his deficiency determination, the Commissioner allowed the Prestons long-term capital loss carryovers to 1976 and 1977 for a long-term capital loss realized in 1975. He also determined that Mr. Preston was liable for the addition to tax for fraud under section 6653(b) for 1976 and 1977. Finally, the Commissioner determined that if Mr. Preston was not liable for the addition to tax for fraud for 1976 and 1977, then the Prestons were liable for the addition to tax under section 6651(a)(1) for failure to timely file a tax return for 1976 and for the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations *181 for 1976 and 1977. After the notice of deficiency had been issued to the Prestons, the Commissioner discovered that Mr. Preston had received $12,410.23 from the Permian Corporation in 1977 which they failed to report on their 1977 return. The Commissioner amended his answer to assert that such amount was includable in the Prestons' 1977 taxable income. In his notice of deficiency to Spade, the Commissioner determined that Spade received drilling income and operating receipts, as well as interest income, and had deductible costs, refunds, and expenses during its 1974 through 1977 taxable years in the amounts determined by Agent Allcorn's investigation. The Commissioner allowed net operating losses from Spade's 1976 and 1977 taxable years to be carried back to its 1974 taxable year. He also determined that Spade was liable for the addition to tax for fraud under section 6653(b) for 1974 and 1975. The Commissioner further determined that if Spade was not liable for the addition to tax for fraud, then it was liable for its 1974 and 1975 taxable years for the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations and for the addition to *182 tax under section 6651 for failure to file tax return or to pay tax. Finally, the Commissioner determined that Spade was liable for the addition to tax under section 6655 for failure to pay estimated tax for its 1974 and 1975 taxable years. OPINION The first issue for decision is whether the Prestons are liable for the deficiencies in income tax for 1976 and 1977 as determined by the Commissioner. They have the burden of disproving the Commissioner's determination. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). However, since the Commissioner asserted in an amendment to his answer that the Prestons received income of $12,410.23 in 1977 which they failed to report, the Commissioner bears the burden of proof with respect to that amount. Rule 142(a). In the present case, Mr. Preston failed to maintain books and records adequate to establish the amount of his taxable income. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. Where a taxpayer fails to keep adequate books and records, the Commissioner is authorized by section 446 to reconstruct the taxpayer's income in accordance with such method as in his opinion does clearly reflect income.This Court has consistently held that the *183 bank deposits and expenditures method, used by the Commissioner in the present case, is a proper method of reconstructing a taxpayer's income; the Commissioner's determination using such method is presumptively correct, and the Prestons have the burden of showing that the determination is erroneous. Mills v. Commissioner,399 F.2d 744, 749 (4th Cir. 1968), affg. a Memorandum Opinion of this Court; Estate of Mason v. Commissioner,64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977). In the present case, the Prestons have completely failed to carry their burden of proof. Mr. Preston's conduct during Agent Allcorn's investigation of the income tax liabilities of the Prestons and Spade was uncooperative and almost entirely unresponsive. Moreover, his testimony at trial was vague, unresponsive, and completely unsubstantiated. Likewise, the Prestons' contentions made in their brief were unsubstantiated, and exhibits attached to their brief are not evidence. Rule 143(b); Evans v. Commissioner,48 T.C. 704, 709 (1967), affd. per curiam 413 F.2d 1047 (9th Cir. 1969); West 80th Street Garage Co. v. Commissioner,12 B.T.A. 798, 800 (1928); Lyon v. Commissioner,1 B.T.A. 378, 379 (1925). *184 In addition, there is no merit to the Prestons' contention that they can elect to recognize income in a later year because they cashed certain checks in the year following Mr. Preston's receipt of those checks; there has been no showing that Mr. Preston's ability to cash the checks was in any way restricted. Estate of Kamm v. Commissioner,349 F.2d 953, 955-956 (3d Cir. 1965), affg. a Memorandum Opinion of this Court; Lavery v. Commissioner,158 F.2d 859, 860 (7th Cir. 1946), affg. 5 T.C. 1283 (1945). With respect to the $12,410.23 in income which the Commissioner asserted in an amendment to his answer that Mr. Preston received in 1977, the Commissioner has adequately proven that Mr. Preston received that amount in 1977. Accordingly, we sustain the Commissioner's deficiency determinations for 1976 and 1977. The second issue for decision is whether Mr. Preston is liable for the addition to tax for fraud for 1976 and 1977. Section 6653(b) provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. The Commissioner has the burden of proving, by clear and convincing *185 evidence, that some part of the underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b); Levinson v. United States,496 F.2d 651, 654-655 (3d Cir. 1974); Miller v. Commissioner,51 T.C. 915, 918 (1969). The Commissioner will carry his burden if he shows that the taxpayer intended to evade taxes which he knew or believed that he owed by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 111-112 (1956). The existence of fraud is a guestion of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed, but rather must be established by affirmative evidence. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Circumstantial evidence is permitted where direct evidence of fraud is not available. Spies v. United States,317 U.S. 492, 499 (1943); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Gajewski v. Commissioner,67 T.C. at 200.Fraud *186 may properly be inferred where an entire course of conduct establishes the necessary intent. Rowlee v. Commissioner,supra;Stone v. Commissioner,56 T.C. 213, 223-224 (1971). The precise amount of underpayment resulting from fraud need not be proved. Otsuki v. Commissioner,53 T.C. 96, 105 (1969). The statute requires only a showing that "any part" of an underpayment results from fraud. However, the Commissioner must show fraud resulting in an underpayment for each taxable year in which fraud has been asserted. Otsuki v. Commissioner,supra.
In the present case, the evidence in the record clearly and convincingly establishes that Mr. Preston fraudulently underpaid his taxes for 1976 and 1977. He underreported his taxable income by substantial amounts, a total of $69,744.41 in 1976 and a total of $27,051.79 in 1977. A consistent pattern of underreporting substantial amounts of income, standing alone, is persuasive evidence of fraud. See Adler v. Commissioner,422 F.2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Estate of Upshaw v. Commissioner,416 F.2d 737, 741 (7th Cir. 1969), affg. on this issue a Memorandum Opinion of this Court; Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), *187 affg. a Memorandum Opinion of this Court; see also Harper v. Commissioner,54 T.C. 1121, 1139 (1970), and cases cited therein. We fully recognize that such principle should be applied with caution where the finding of unreported income is based upon a taxpayer's failure to meet his burden of proof. Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971); Otsuki v. Commissioner,supra at 106. However, our finding of fraud is not based on the Prestons' failure to carry their burden of proof on the deficiency issue. Mr. Preston was a sophisticated individual who orchestrated a series of elaborate and complex business transactions which were primarily motivated by tax considerations. He protests that he is nothing more than a small-time oil operator. However, the testimony of Mr. Skaggs, whom Mr. Preston set up as the president of Pima, directly contradicts Mr. Preston's assertion. Mr. Skaggs, whom we found to be credible and forthright, testified emphatically that Mr. Preston organized and was responsible for the elaborate transactions engaged in by Pima and Spade, and that tax considerations were the primary factors motivating the investors in Pima. The record clearly belies Mr. *188 Preston's attempt to paint himself as the unsophisticated innocent. In addition, the Prestons have offered no credible explanation for the omissions in reported income for 1976 and 1977, strongly suggesting that the omissions were deliberate and not inadvertent or the result of mistake. Stone v. Commissioner,56 T.C. at 224-225; Smith v. Commissioner,32 T.C. 985, 987 (1959). The Prestons had a duty to keep adequate books and records. Sec. 6001. During the investigation and at trial, Mr. Preston produced no records and admitted that he had kept no records, other than certain bank records which the Commissioner had independently obtained during his investigation. Mr. Preston's failure to maintain adequate records is some evidence of fraud. Harper v. Commissioner,54 T.C. at 1141; Otsuki v. Commissioner,53 T.C. at 110. Furthermore, the Prestons filed their income tax returns for 1976 and 1977 late, and they filed such returns in response to a request by the Commissioner. Finally, Mr. Preston's conduct was clearly designed to thwart Agent Allcorn's investigation. Such conduct suggests that Mr. Preston was attempting to conceal unreported income. Mr. Preston has never contended *189 that he was unaware of Agent Allcorn's investigation or that he did not know about the agent's attempts to reach him. In fact, it is clear that Mr. Preston was fully aware of the Commissioner's investigation and that he communicated with Agent Allcorn only when it became clear that the agent had uncovered substantial amounts of unreported income. Such conduct standing alone might not be sufficient to prove fraud, but in conjunction with the other evidence of fraud in the record, it is clear evidence of Mr. Preston's fraudulent intent. See Powell v. Granquist,252 F.2d 56, 60-62 (9th Cir. 1958). In Mr. Preston, we have a taxpayer who has sufficient understanding of tax matters to set up a tax shelter for investors. When a taxpayer with such sophistication in tax matters fails to report substantial amounts of income and fails to respond to inquiries by the IRS, we must conclude that the omissions of income and the failure to respond were not due to mere oversight; we must infer that they were deliberate. The substantial underreporting of income, the failure to offer any plausible explanation for such underreporting, and the uncooperative conduct throughout the investigation and at *190 trial, all clearly demonstrate that the underpayments of tax were due to fraud by Mr. Preston. Consequently, we hold that the Commissioner has proven, by clear and convincing evidence, that some part of the underpayment of tax for each year was due to fraud within the meaning of section 6653(b). Our determination of this issue makes it unnecessary for us to consider the Commissioner's alternative determinations with respect to the additions to tax under sections 6651(a) and 6653(a). The third issue for decision is whether Spade is liable for the deficiencies in income tax for its 1974 and 1975 taxable years as determined by the Commissioner. Spade has the burden of disproving the Commissioner's determination. Rule 142(a); Welch v. Helvering,supra.
On brief, Spade has alleged that the Commissioner erred in his determination of Spade's income tax liabilities for its 1974 and 1975 taxable years. However, Spade's allegations were completely unsupported by evidence in the record. Accordingly, we hold that Spade has failed to carry its burden of proof, and we sustain the Commissioner's deficiency determinations for Spade's 1974 and 1975 taxable years, except insofar as such determinations *191 are affected by the Commissioner's use of an incorrect figure for Spade's bank balance at the beginning of its 1974 taxable year. The fourth issue for decision is whether Spade is liable for the addition to tax for fraud under section 6653(b) for its 1974 and 1975 taxable years. Agent Allcorn's investigation was an investigation of the income tax liabilities of both the Prestons and Spade covering the years 1974 through 1977. Mr. Preston was the sole shareholder and president of Spade. Essentially, Spade was Mr. Preston doing business in the corporate form. Mr. Preston's conduct (including his lack of cooperation during the investigation), therefore, is properly attributable to Spade. As Agent Allcorn's investigation revealed, Spade had substantial taxable income during its 1974 and 1975 taxable years. During its 1974 taxable year, Spade had drilling income and operating receipts of $368,982.00, as well as interest income of $6,763.30. During its 1975 taxable year, Spade had drilling income and operating receipts of $240,501.81. Such amounts exceeded its deductible expenses in both years. Yet, Spade filed no income tax returns for those years. While failure to file is not *192 conclusive evidence of fraud, it is a factor worthy of consideration. Hebrank v. Commissioner,81 T.C. 640, 642 (1983). We must attribute Mr. Preston's knowledge and understanding to Spade, and when we do so, we must conclude that the failure to file such returns was not a mere oversight but was an effort by a sophisticated taxpayer to evade the payment of taxes by Spade. Thus, we conclude that Spade's failure to file income tax returns for its 1974 and 1975 taxable years was willful and purposefully designed to conceal income and avoid the tax due on such income. Accordingly, based on the record in the present case, we hold that the Commissioner has, by clear and convincing evidence, proven that the underpayments of Spade's taxes for its 1974 and 1975 taxable years were due to fraud. Our determination of this issue makes it unnecessary for us to consider the Commissioner's alternative contentions with respect to the additions to tax under sections 6651(a) and 6653(a). The final issue for decision is whether Spade is liable for the addition to tax under section 6655 for failure to pay estimated income tax for its 1974 and 1975 taxable years. Spade has the burden of disproving *193 the Commissioner's determination as to an addition to tax under section 6655. Rule 142(a). Since it has made no effort to introduce evidence to disprove the Commissioner's determination, we sustain such determination. Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years at issue.↩
2. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.↩
3. In calculating the amount of deductible costs, refunds, and expenses for Spade's 1974 taxable year in his notice of deficiency, the Commissioner showed the amount for Spade's bank balance at the beginning of such year as $3,264.60. The figure shown on Agent Allcorn's worksheets for such bank balance is $30,264.60. The parties can take the error in the notice of deficiency into account in their computations under Rule 155.