JOSEPH E. TEAGUE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Teague v. Commissioner
Docket No. 19170-81.
United States Tax Court
T.C. Memo 1986-593; 1986 Tax Ct. Memo LEXIS 13; 52 T.C.M. (CCH) 1209; T.C.M. (RIA) 86593; December 22, 1986. Joseph E. Teague, pro se. Susan Wynne, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioner's Federal income taxes and additions to tax under section 6653(b)[1] as follows: Addition to Tax
Taxable Year
Deficiency
Under Sec. 6653(b)
1974
$11,208
$5,604
1975
39,488
19,744
1976
4,498
2,249
1977
57,820
28,910
1978
143,704
71,852
The issues for decision are: (1) whether petitioner failed to report income earned with respect to his citrus harvesting business and service station during the traxable years in issue; and (2) whether petitioner is liable for the addition to tax under section 6653(b) or, alternatively, whether petitioner is liable for the additions to tax under sections 6651(a)(1) and 6653(a). FINDINGS OF FACT Some of the facts have been stipulated *15 and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner, Joseph E. Teague, resided in Vero Beach, Florida, at the time he filed his petition in this case. Petitioner failed to file Federal income tax returns for each of the taxable years 1974 through 1978. Petitioner filed Federal income tax returns showing taxable income for the taxable years 1962 through 1973. During the texable years in issue, petitioner operated a fruit harvesting business as a sole proprietorship. The business, known as River Harvesting, contracted with packing houses and growers to harvest their fruit. River Harvesting was hired as an independent contractor. All social security taxes and withholding taxes to be paid on behalf of River Harvesting's workers were the responsibility of River Haresting. River Harvesting picked for two fruit companies, Quality Fruit Packers and Gracewood Fruit Company. Petitioner maintained no records as to the amount of gross receipts of River Harvesting. However, petitioner did maintain some recordd of the amount of wages paid by River Harvesting. During 1977 and 1978, petitioner operated a service *16 station as a sole proprietorship under the name Holiday Gulf Service Station (Holiday Gulf). Holiday Gulf purchased gasoline from Gulf Oil Corporation and non-gasoline products from Walker Petroleum Distributors. Petitioner kept books and records, including records of sales and purchases, for Holiday Gulf. In March 1978, Revenue Officer Charles Moran was assigned the case file on petitioner for non-filed Federal income tax returns for the taxable years 1974 through 1977. On May 15, 1978, he met with petitioner and requested that petitioner provide him with Federal income tax returns for the taxable years 1974 through 1977. Petitioner told Revenue Officer Moran that the returns were being prepared or would be prepared. On June 30, 1978, Revenue Officer Moran again visited petitioner to request the delinquent Federal income tax returns. Petitioner informed him that the delinquent returns were being prepared by an accountant. On July 24, 1978, Revenue Officer Moran again visited petitioner to discuss the delinguent returns. Petitioner advised him that the accountant would be coming in the following day to secure the records necessary to prepare the returns. On September 21, 1978, Revenue *17 Officer Moran telephoned petitioner and was informed by petitioner that the accountant had all the records necessary to prepare the returns. However, no returns were ever filed with Revenue Officer Moran. Revenue Officer Moran moved to another city and, in October 1978, petitioner's case was assigned to Revenue Officer G.W. Greer. Revenue Officer Greer first met with petitioner on October 26, 1978, and requested that petitioner file his Federal income tax returns for the taxable years 1974 through 1977. Petitioner informed Revenue Officer Greer that he was having difficulty getting his records together because the manager at the service station and a key employee of the fruit picking operation terminated their employment, and that he had not had time to get the records together and to his accountant.Revenue Officer Greer gave petitioner a deadline of November 24, 1978, to file his delinquent Federal income tax returns. Petitioner failed to meet this deadline. On December 4, 1978, Revenue Officer Greer issued and personally served on petitioner an Internal Revenue Service administrative summons requiring petitioner to appear on December 20, 1978, to testifity and to produce *18 for examination certain books of account and records relating to petitioner's tax liabilities for the taxable years 1974 through 1977. Petitioner failed to appear before Revenue Officer Greer on December 20, 1978.On December 21, 1978, Revenue Officer Greer Referred the administrative summons for enforcement. On January 24, 1979, the Office of District Counsel, Miami, Florida, mailed a letter to petitioner, by certified mail, notifying petitioner that he was required to appear before Revenue Officer Greer on February 14, 1979, in compliance with the administrative summons. On February 9, 1979, petitioner telephoned Revenue Officer Greer to inform him that the Federal income tax returns for the taxable years 1974 through 1977 would be delivered by February 14, 1979. On February 14, 1979, petitioner failed to appear but Revenue Officer Greer received by mail Federal income tax returns executed by petitioner for the taxable years 1974 through 1977. However, petitioner reported no amounts of income or deductions on these returns and was aware when he filed them that they did not contain information from which a tax liability could be determined. Instead, petitioner stated Fifth Amendment *19 objections on the returns. However, in his prior conversations with Revenue Officers Moran and Greer petitioner never voiced any Fifth Amendment objections to filing Federal income tax returns. Revenue Officer Greer referred petitioner's case to the Internal Revenue Service's tax protestor coordinator in Jacksonville, Florida. Petitioner's case was subsequently assigned to Revenue Agent Annette Skaggs. On July 19, 1979, Revenue Agent Skaggs met with petitioner and requested books and records supporting income and expenses for River Harvesting and Holiday Gulf. Petitioner failed to provide Revenue Agent Skaggs with the requested books and records. Petitioner did not voice any Fifth Amendment objections to filling Federal income tax returns. He did, however, tell Revenue Agent Skaggs the names of the fruit companies that River Harvesting contracted with and the names of the companies that supplied gasoline and non-gasoline products to Holiday Gulf. On August 13, 1979, Revenue Agent Skaggs sent letters to Quality Fruit Packers and Gracewood Fruit Company requesting information as to the amounts that had been paid to River Harvesting. Revenue Agent Skaggs began working in the *20 field audit group and, in November 1979, petitioner's case was assigned to Revenue Agent Gus Spilios. Revenue Agent Spilios met with petitioner in November 1979, and requested books and records for River Harvesting and Holiday Gulf. Petitioner failed to provide Revenue Agent Spilios with any of the requested books and records. He also met with petitioner in May 1980, and discussed the reconstruction of petitioner's income. Revenue Agent Spilios requested receipts, invoices, or other documentation supporting allowable expenses. Petitioner, however, did not provide any information. During the course of these meetings, petitioner did not voice any Fifth Amendment objections to filing Federal income tax returns. On June 20, 1980, Revenue Agent Spilios prepared and filed substitute returns for petitioner for the taxable years 1974 through 1978. For the taxable year 1974, petitioner received a Form W-2 from Quality Fruit Packers showing $10,725 of gross income from which Federal income tax of $1,067 was withheld. Revenue Agent Spilios reconstructed petitioner's other income using third-party information. The income of River Harvesting was computed using the information received *21 from Quality Fruit Packers and Gracewood Fruit Company. The information provided the amounts paid to River Harvesting. These amounts were used as the gross receipts of River Harvesting. Also included in the information were payments made to the fruit companies by River Harvesting for the rental of equipment and the purchase of equipment. Both the equipment rental and purchase payments were allowed as deductions. The cost of labor was determined by taking the average cost or average picking rate, provided by Quality Fruit Packers, and comparing it to the total amount petitioner was paid by the fruit companies. A cost of labor of 57 percent of gross receipts was computed and allowed as a deduction. Correspondence of Florida Farm Bureau Insurance Company shows that River Harvesting made insurance premium payments of $3,662 for the period November 19, 1974 to October 26, 1975, $10,480 for the period January 15, 1976 to January 15, 1977, $7,398 for the period January 15, 1977 to January 15, 1978, and $6,280 for the period January 15, 1978 to January 15, 1979. However, a deduction for the insurance premium payments was not allowed. The income of Holiday Gulf was computed by obtaining *22 from Gulf Oil Corporation the amount of gasoline purchased by Holiday Gulf. Revenue Agent Spilios then telephoned Walker Petroleum Distributors to obtain the wholesale prices of gasoline at various times in 1977 and 1978. Information supplied in Gulf Oil Company's Automotive & Marine Gasoline Schedule of TW [Tank Wagon] Prices was used to verify the verbal information supplied by Walker Petroleum Distributors. The wholesale price per gallon for the various time periods was then multiplied by the number of gallons of gasoline purchased during such time periods to determine the cost of gasoline purchased by Holiday Gulf for the taxable years 1977 and 1978. To determine the cost of non-gasoline products purchased by Holiday Gulf, Revenue Agent Spilios contacted Walker Petroleum Distributors, who supplied non-gasoline products to Holiday Gulf. The cost of gasoline and cost of non-gasoline products were combined to determine the total cost of goods sold. The gross receipts for Holiday Gulf were calculated by using the percentage markup method. The Audit Technique Handbook for Internal Revenue Agents provided that a 20.5 gross profit percentage was appropriate for comparable service *23 stations. Using this percentage, the cost of goods sold is 79.5 percent of the gross receipts and, therefore, the cost of goods sold divided by 79.5 percent equals the gross receipts. Once the gross receipts were calculated the cost of goods sold was deducted to arrive at the gross profit of Holiday Gulf. When Revenue Agent Spilios met with petitioner in May 1980, he requested receipts, invoices, or other documentation supporting allowable operating expenses, such as wages, repairs, and insurance. Petitioner did not provide any information regarding operating expenses. Accordingly, no deductions were allowed for operating expenses in calculating the net income of Holiday Gulf. However, audited payroll records prepared by Florida Farm Bureau Insurance Company for insurance purposes shows that Holiday Gulf paid wages of $1,758 for the period January 15, 1977 to January 15, 1978, and $48,559 for the period January 15, 1978 to January 15, 1979. Holiday Gulf also provided light repair work on cars and trucks including tune-ups, brakes, and oil changes. The mechanic who performed these services charged $15 an hour and usually worked 5-1/2 days per week. The profit on these services *24 was not considered in the computation of gross receipts. On April 17, 1981, the Commissioner issued a statutory notice of deficiency to petitioner for the taxable years 1974 through 1978 and determined the following amounts of unreported income: Year
Unreported Income
1974
$28,142
1975
74,869
1976
13,546
1977
103,116
1978
225,622
OPINION The Commissioner's determination of a deficiency in tax has the support of a presumption of correctness, and petitioner has the burden of proving it wrong. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). A showing by petitioner that the statutory notice is arbitrary and excessive will destory the presumption of correctness. Helvering v. Taylor,293 U.S. 507 (1935). Section 6001 imposes on all taxpayers the obligation to keep records as prescribed by the Secretary in rules and regulations. This statutory command is implemented by section 1.6001-1(a), Income Tax Regs. *25 , which requires each person subject to income tax to "keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information." Section 1.446-1(a)(4), Income Tax Regs., similarly dictates that each taxpayer must maintain such accounting records as will enable him to file a correct return and that these required accounting records include the taxpayer's regular books of account and such other records and data as may be necessary to support the entries on the books of account. Where the taxpayer fails to produce or maintain adequate records from which actual income may be ascertained, the Commissioner may use any reasonable method to reconstruct taxable income. Goodmon v. Commissioner,761 F.2d 1522, 1524 (11th Cir. 1985). Respondent reconstructed the income of River Harvesting by the specific item method of income reconstruction, using the information received from Quality Fruit Packers and Gracewood Fruit Company. This method has been approved by this Court. [2] The *26 information provided the amounts paid to River Harvesting. These amounts were totaled to determine the gross receipts of River Harvesting. Also included in the information were payments made to the fruit companies by River Harvesting for the rental of and the purchase of equipment. Both the equipment rental and purchase payments were allowed as deductions. A cost of labor of 57 percent of gross receipts was computed and allowed as a deduction. However, respondent erred in not allowing a deduction for the insurance premium payments as shown in the correspondence of Florida Farm Bureau Insurance Company. We recognize that the dates of the insurance policies do not coincide exactly with calendar years but, all methods of reconstructing income are imprecise and we hold that River Harvesting is entitled to insurance deductions of $3,662, $10,480, $7,398, and $6,280 for the taxable years 1975, 1976, 1977, and 1978, respectively. Petitioner *27 did not supply the Court with any records or evidence concerning the income or expenses of River Harvesting. Petitioner did introduce into evidence a Schedule C, Profit or (Loss) From Business or Profession, for his brother's citrus harvesting business for the taxable year 1979. However, it was not established that the citrus harvesting business of the brother was comparable to that of petitioner. Petitioner's brother was never called as a witness. The Schedule C does not constitute reliable evidence of the expenses incurred by petitioner in his citrus harvesting business. Petitioner concedes on brief the correctness of respondent's calculation of the gross receipts and labor costs of River Harvesting. However, petitioner contends that he incurred other costs equal to 37 percent of the gross receipts. Petitioner requests that we take judicial notice of the various costs involved in a citrus harvesting business found in a report entitled "Estimated Cost of Picking and Hauling Florida Citrus, 1982-83 Season," published by the University of Florida (the Report). The Report shows changes in the amounts of items that make up the estimated total picking and hauling costs for oranges *28 for the period 1960 to 1983. Petitioner requests that we take judicial notice of the various costs involved in a citrus harvesting business based upon the items listed in the Report. Rule 201(b) of the Federal Rules of Evidence governs the type of facts of which judicial notice can be taken and provides that: (b) Kinds of Facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. The Advisory Committee Notes to the Federal Rules of Evidence state as follows: Subdivision (b). With respect to judicial notice of adjudicative facts, the tradition has been one of caution in requiring that the matter be beyond reasonable controversy. This tradition of circumspection appears to be soundly based, and no reason to depart from it is apparent. * * * The rule proceeds *29 upon the theory that these considerations call for dispensing with traditional methods of proof only in clear cases. * * * This rule is consistent with Uniform Rule 9(1) and (2) which limit judicial notice of facts to those "so universally known that they cannot reasonably be the subject of dispute," those "so generally known or of such common notoriety within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute," and those "capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy." The traditional textbook treatment has included these general categories (matters of common knowledge, facts capable of verification), McCormick §§ 324, 325, and then has passed on into detailed treatment of such specific topics as facts relating to the personnel and records of the court, Id. § 327, and other governmental facts, Id. § 328. * * * [Advisory Committee's Notes, 56 F.R.D. 183, 204-205.] The Report lists items that comprise the estimated total picking and hauling costs for *30 oranges. However, this does not establish that all citrus harvesting businesses incur the same expenses in the same amounts. The nature and amount of the expenses incurred by River Harvesting is at the very heart of the controversy. The nature and amount of expenses incurred in a citrus harvesting business is not generally known within the territorial jurisdiction of this Court nor is it capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Accordingly, we decline to take judicial notice of the Report. Cf. Reis v. Commissioner, 87 T.C.     (Nov. 10, 1986). We point out that the Report was attached to petitioner's reply brief. The Report was not discussed at trial and was not offered into evidence. Ex parte affidavits and statements in briefs do not constitute evidence and will not be considered by the Court. Rule 143(b); Evans v. Commissioner,48 T.C. 704, 709 (1967), affd. per curiam 413 F.2d 1047 (9th Cir. 1969); West 80th Street Garage Co. v. Commissioner,12 B.T.A. 798, 800 (1928). *31 Petitioner also urges us to make an approximation of other operating expenses incurred by River Harvesting. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). However, petitioner has not introduced competent, reliable evidence as to the nature or amounts of additional operating expenses incurred by River Harvesting. There is simply no basis upon which to make a reasonable estimate. Respondent reconstructed the income of Holiday Gulf by the percentage markup method, using information obtained from Gulf Oil Corporation and Walker Petroleum Distributors. [3]Gibson v. United States,360 F.2d 457 (5th Cir. 1966). The amount of gasoline purchased was obtained by respondent from Gulf Oil Corporation. The wholesale price of the gasoline was then determined and multiplied by the number of gallons of gasoline purchased to arrive at the cost of gasoline. The cost of non-gasoline products was obtained from Walker Petroleum Distributors, who supplied non-gasoline products to Holiday Gulf. The cost of gasoline and cost of non-gasoline products were combined to determine the total cost of goods sold. The Audit Technique Handbook for Internal Revenue Agents *32 provided that a 20.5 gross profit percentage was appropriate for comparable service stations. Once the gross receipts were calculated the cost of goods sold was deducted to determine the gross profit. However, in calculating the net income of Holiday Gulf no deductions were allowed for operating expenses. Respondent erred in not allowing a deduction for wages as shown in the audited payroll records prepared by Florida Farm Bureau Insurance Company. We recognize that the periods for which the wages were paid do not coincide exactly with calendar years but, as we stated earlier, all methods of reconstructing income are imprecise and we hold that Holiday Gulf is entitled to wage deductions of $1,758 and $48,559 for the taxable years 1977 and 1978, respectively. [4]
*33 The only records or evidence that petitioner supplied the Court concerning the income or expenses of Holiday Gulf was a partial summary of profits and losses for the taxable year 1978. However, the portion of the document that identifies the figures was not introduced. There is no indication as to what items of income or expense, if any, the document is referring. The document does not constitute competent reliable evidence to support any finding by this Court as to what, if any, expenses petitioner may have incurred, nor does it adequately substantiate the amount of any expenses. Petitioner concedes on brief the correctness of respondent's calculation of the gross receipts and cost of goods sold of Holiday Gulf. However, petitioner contends that he incurred other operating expenses that caused the net income of Holiday Gulf to be zero. Petitioner urges us to make an approximation of the other operating expenses. Cohan v. Commissioner,supra. We will not apply the Cohan rule because petitioner maintained books and records. If he believed Holiday Gulf was entitled to deductions for operating expenses he could have introduced the books and records *34 into evidence. Any injustice which may have resulted to petitioner from respondent's adjustments was within petitioner's own power to correct by making his records available. Respondent must be given great latitude in determining petitioner's liability, particularly when the taxpayer refuses to cooperate in such determination. Giddio v. Commissioner,54 T.C. 1530, 1533 (1970). Cf. Rosenstein v. Commissioner,32 T.C. 230 (1959). We must now decide whether any part of the underpayments of tax for the taxable years 1974, 1975, 1976, 1977, and 1978 was due to fraud. Section 6653(b) provides that if any part of an underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. Respondent bears the burden of establishing by clear and convincing evidence the elements of the section 6653(b) fraud addition. Sec. 7454(a); Rule 142(b); Stone v. Commissioner,56 T.C. 213, 220 (1971). *35 The elements to be shown are (1) an underpayment of tax, and (2) that some part of this underpayment was due to fraud. Hebrank v. Commissioner,81 T.C. 640, 642 (1983). Respondent need not prove the precise amount of underpayment resulting from fraud, but only that some part of the underpayment is attributable to fraud. [5]Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court. Respondent must prove that petitioner intended to evade taxes that he knew or believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Korecky v. Commissioner,781 F.2d 1566, 1568 (11th Cir. 1986), affg. a Memorandum Opinion of this Court. However, respondent cannot satisfy his burden of establishing fraud by relying solely on petitioner's failure to discharge his burden of proving error in the determination of the deficiency. Otsuki v. Commissioner,53 T.C. 96, 106 (1969); Pigman v. Commissioner,31 T.C. 356, 370 (1958). *36 The issue of fraud poses a factual question that is to be decided on an examination of all the evidence in the record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Stone v. Commissioner,56 T.C. at 224. Fraud can seldom be established by direct proof of the taxpayer's intention; therefore, the taxpayer's entire course of conduct must be considered, and fraudulent intent can be established by circumstantial evidence. Stephenson v. Commissioner,79 T.C. 995, 1006 (1982), affd. per curiam 748 F.2d 331 (6th Cir. 1984); Grosshandler v. Commissioner,75 T.C. 1, 19 (1980). Fraud is never imputed or presumed and courts should not sustain findings of fraud upon circumstances that at most create only suspicion. Green v. Commissioner,66 T.C. 538, 550 (1976). Respondent has affirmatively shown various indicia of fraud. Petitioner failed to file timely Federal income tax returns for the taxable years 1974, 1975, 1976, 1977, and 1978. Petitioner knew he had a duty to file returns as *37 evidenced by petitioner's filing of Federal income tax returns for the taxable years 1962 through 1973. While the failure to file tax returns, even over an extended period of time, does not conclusively establish fraud, Kotmair v. Commissioner,86 T.C. 1253, 1261 (1986), the failure to file returns is persuasive circumstantial evidence of fraud. Marsellus v. Commissioner,544 F.2d 883, 885 (5th Cir. 1977), affg. a Memorandum Opinion of this Court. This failure to file returns also occurred despite requests from Revenue Officers Moran and Greer to file the returns. In this context, petitioner's inaction weighs heavily against him. On February 14, 1979, petitioner did send Federal income tax returns for the taxable years 1974 through 1977 to Revenue Officer Greer. However, on the Federal income tax returns petitioner reported no amounts of income or deductions and was aware when he filed them that they did not contain information from which a tax liability could be determined. Instead, petitioner stated Fifth Amendment objections on the returns. A *38 tax return that contains Fifth Amendment objections, when the taxpayer has earned sufficient income to be required to file a return, is indicative of fraudulent intent. Goodmon v. Commissioner,761 F.2d at 1524. Further, during the taxable years in issue, petitioner knew he had received substantial amounts of income from River Harvesting and Holiday Gulf. Such consistent substantial omissions of income are strong evidence of fraud. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court. Petitioner did not maintain any books and records as to gross receipts received from Quality Fruit Packers and Gracewood Fruit Company, but he did maintain some records as to the amount of wages paid. Failure to maintain complete and accurate records is an indication of fraud. Korecky v. Commissioner,781 F.2d at 1568; Woodham v. Commissioner,256 F.2d 201, 204 (5th Cir. 1958), affg. a Memorandum Opinion of this Court. Petitioner testified that when he was moving from his office to his home in the middle of 1976, one of the men helping him move got drunk and threw away some of *39 his books and records and that as a result he did not have the records necessary to prepare his Federal income tax returns. Petitioner testified that it was his understanding that if he entered incorrect figures on his Federal income tax returns it would be fraud. He further testified that since he did not have the necessary records he filed Federal income tax returns with Fifth Amendment objections. Petitioner, however, never voiced Fifth Amendment objections to Revenue Officers Moran or Greer or Revenue Agents Skaggs or Spilios. Assuming the records were destroyed in 1976, this does not explain why records were not kept for the last half of the taxable year 1976 and the taxable years 1977 and 1978 and the fact that records were not kept for this time period indicates to us that records probably were not maintained prior to their alleged destruction in 1976. Furthermore, there is nothing in the record to indicate that petitioner made any attempt to reconstruct the income of River Harvesting by obtaining information from third parties. Petitioner did maintain books and records, including records of sales and purchases, for Holiday Gulf. However, the books and records were not *40 made available to respondent's representatives. Petitioner failed to comply with the administrative summons issued by Revenue Officer Greer to appear and to produce the books and records. In addition, petitioner failed to provide Revenue Agents Skaggs and Spilios with the books and records when they requested them. As a result of petitioner's failure to fully cooperate, respondent had to resort to third-party information in his determination of petitioner's tax liability. Petitioner did provide Revenue Agent Skaggs with the names of the fruit companies that River Harvesting contracted with and the names of the companies that supplied gasoline and non-gasoline products to Holiday Gulf. Nonetheless, petitioner's refusal to fully cooperate in the attempt to determine his correct tax liability is, in this context, a further indication of fraud. Korecky v. Commissioner,781 F.2d at 1568-1569; Rowlee v. Commissioner,80 T.C. 1111, 1125 (1983). Petitioner asserts that he did not possess the requisite fraudulent intent relying upon Raley v. Commissioner,676 F.2d 980 (3d Cir. 1982), revg. a Memorandum Opinion of this Court. In *41 Raley v. Commissioner,supra, the taxpayer wrote and mailed letters to various officials involved in Federal tax collection efforts, informing them that he was not going to pay any Federal income taxes. The Third Circuit held that the taxpayer's letters were sufficient to negate a finding of fraudulent intent. However, the instant case is distinguishable from Raley v. Commissioner,supra, as petitioner engaged in no such pattern of notification. Petitioner filed no returns until respondent's agents caught up with him. Assuming that petitioner's records were destroyed in 1976, he had the records available to timely file his Federal income tax return for the taxable year 1974, which he failed to do. We can only conclude that he did not intend to file until his nonfiling was discovered. Such conduct constitutes willful concealment of income to evade payment of taxes. Grosshandler v. Commissioner,75 T.C. at 20. In view of the foregoing we hold that respondent has shown by clear and convincing evidence that in each taxable year an underpayment existed and that a part of such underpayment was due to fraud and, therefore, *42 the additions to tax under section 6653(b) will be sustained. Our holding with respect to fraud under section 6653(b) eliminates the need to consider respondent's alternative position with respect to the additions to tax under sections 6651(a)(1) and 6653(a). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the relevant years, and all Rule references are to the Rules of Practice and Procedure of this Court.↩
2. We note that in Bolton v. Commissioner,T.C. Memo. 1975-373↩, we approved the use of the specific item method of income reconstruction with respect to a taxpayer who failed to report any income from a scrap metal business.
3. Frank v. Commissioner,T.C. Memo. 1982-214↩, dealt with the reconstruction of the income of a gas station. We noted that the use of the percentage markup method was particularly appropriate because the amounts of purchase of gasoline, oil, and other lubricants could be readily computed from the suppliers statements. 4. Correspondence of the Florida Farm Bureau Insurance Company calculates one insurance premium for River Harvesting and Holiday Gulf. Accordingly, River Harvesting's insurance deduction includes insurance attributable to Holiday Gulf.↩
5. Sec. 6653(b)↩ has been amended, effective for returns due after December 31, 1986, by sec. 1503(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat.    . The addition to tax has been increased to 75 percent. However, the additional applies only to the portion of the underpayment that is attributable to fraud.